UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

BDG GOTHAM RESIDENTIAL, LLC, and ZDG, LLC,

                Plaintiffs,

    -v-

WESTERN WATERPROOFING COMPANY, INC. d/b/a
WESTERN SPECIALTY CONTRACTORS and WESTERN
SURETY COMPANY,

              Defendants,

-------------------------------------------------------------------X

Civil Action No. 1:19-cv-06386 (AJN)

**AMENDED COMPLAINT**

       Plaintiffs BDG Gotham Residential, LLC ("Gotham") and ZDG, LLC ("ZDG") (collectively, "Plaintiffs"), by their respective attorneys Duane Morris LLP (for Gotham) and Peckar & Abramson, P.C. (for ZDG), as and for their Amended Complaint against defendants Western Waterproofing Company, Inc., d/b/a Western Specialty Contactors ("Western"), and Western Surety Company ("Surety"), respectfully allege as follows:

## JURISDICTION, VENUE, AND THE PARTIES

    1.    This is a civil action where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.  Federal jurisdiction therefore exists under 28 U.S.C. 1332.

    2.    At all times hereinafter relevant, Plaintiff Gotham was and is a Delaware limited liability company, with offices located c/o Blumenfeld Development Group, Ltd., 300 Robbins Lane, Syosset, New York 11791.

    3.    At all times hereinafter relevant, Plaintiff ZDG was and is a domestic limited liability company, with offices located at 192 Lexington Avenue, 3rd Floor, New York, New York 10016.

4.      Upon information and belief, at all times hereinafter mentioned, Defendant Western was and is a Missouri corporation authorized to do business in the State of New York, with an address located at 720 Grand Avenue, Ridgefield, New Jersey 07657.

5.      Upon information and belief, at all times hereinafter mentioned, Defendant Surety was and is a South Dakota corporation authorized to do business as a surety company in the State of New York, with an address located at 333 South Wabash Avenue, 22nd Floor, Chicago, Illinois 60604.

6.      As set forth more fully herein, the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

7.      Venue is proper in this Court based upon the designation in the contract between the parties.

## BACKGROUND

8.      Upon information and belief, Western is a privately owned masonry, concrete and facade installation and restoration company, that has operated for over 100 years and employs nearly 1000 people nationwide. Western has its headquarters in St. Louis, Missouri, and over twenty branches across the country, including the Facades Division, based in Ridgefield, New Jersey, serving the New York City Metropolitan area.

9.      On or about September 1, 2016, Gotham, as owner of a parcel of land located at 158 East 126th Street, with the legal address of 149 East 125th Street (the "Premises"), entered into an agreement in writing with ZDG, as construction manager (the "CM Agreement"), for the construction of an eleven-story mixed use building, with commercial space on the ground floor level and residential units above (the "Project"). Gotham and ZDG beg leave to refer to the CM Agreement upon the trial of this action with the same force and effect as if fully set forth at length herein and hereby incorporate the same by reference herein.

2

DM1\9986472.1

---

10. On or about April 7, 2017, ZDG, in turn, entered into a subcontract agreement with Western Specialty Contractors to install the building's facade (the "Subcontract") for consideration set forth therein. For the north facade, facing East 126th Street, the Subcontract called for a checkerboard pattern curtain wall, with alternating blackened stainless steel and glazed window panels, using materials designed for the Project. Gotham and ZDG beg leave to refer to the Subcontract upon the trial of this action with the same force and effect as if fully set forth at length herein and hereby incorporate the same by reference herein.

11. Timothy Braico ("Braico") was the senior branch manager of the Facades Division, overseeing all Facades Division projects.

12. Braico was hired by Western in 2017 as a curtain wall superintendent and was promoted to branch manager in March 2018.

13. Braico's responsibilities included ensuring that all Facades Division projects adhered to all United States Department of Labor Occupational Safety and Health Administration ("OSHA") and New York City Department of Buildings ("DOB") applicable safety rules and regulations.

14. Terrence Edwards ("Edwards") was a curtain wall superintendent for the Facades Division of Western, reporting to Timothy Braico. Edwards's duties included direct supervision of construction workers and site safety on the Project. On June 25, 2018, Edwards was the on-site supervisor for Western's employees assigned to the Project, including ironworkers Christopher Jackson and Jorge Delgado.

15. The Subcontract required Western to follow all applicable OSHA and DOB safety rules and standards, and to obtain all necessary permits and certifications.

3

DM1\9986472.1

16.     The Subcontract provides that Gotham is an express third party beneficiary thereof.

17.     The Subcontract required Western to provide payment and performance bonds to secure Western's performance of its obligations to ZDG and Gotham.

18.     On or about May 31, 2017, Western and Surety executed and delivered to ZDG and Gotham a Performance Bond No. 30003913 (the "Bond") together with a Labor and Materials Payment Bond No. 30003913, both in the penal sum of $3,410,000, copies of which are annexed hereto as Exhibit "A". Gotham and ZDG beg leave to refer to the Bond upon the trial of this action with the same force and effect as if fully set forth at length herein and hereby incorporate the same by reference herein.

19.     Gotham and ZDG are both named as Obligees pursuant to the terms of the Bond.

20.     Pursuant to the terms of the Bond, Surety agreed to commence performance and completion of Western's obligations under the Subcontract within thirty (30) days of notice to Surety of a declaration of default on the part of Western, and to perform and complete the same within the time required under the Subcontract.

21.     Pursuant to the terms of the Bond, Surety agreed that the intent of the Bond is that Surety's obligation to complete shall be absolute and that any dispute relating to the performance of the Subcontract shall be disposed of at a later date and without interference in, or with the performance of, the Subcontract.

<u>**PERFORMANCE MOCK UP DELAYS**</u>

22.     Part of Western's work pursuant to the Subcontract was to successfully construct a "Performance Mock Up" ("PMU") of the curtain wall it was to install and to do so timely so as not to delay the Project.

4

23.     In breach of the Subcontract, Western failed to timely and properly perform its PMU work, which resulted in costs delays to the Project and associated costs to Gotham and ZDG.

## EVENTS LEADING UP TO JUNE 25, 2018

24.     In June 2018, Western Specialty Contractors began the curtain wall installation at the Project, starting with the north facade, with the initial plan to lift the panels into place using a Glazier rig 2200 mechanical hoist.

25.     In mid-June 2018, Braico and Edwards ordered a Jekko MPK20W+ mini crane from a construction equipment rental company to replace the Glazier rig 2200.  Before using such a mini crane, the DOB required Western Specialty Contractors: 1) to engage a licensed engineer to assess the project and create design drawings showing how the mini crane was to be used, that it could support the intended load, and how and where it would be tied off to avoid a fall, and to submit these drawings to the DOB to obtain an Alteration Type 2 ("Alt 2") building permit; and 2) to ensure that the mini crane operator had successfully completed a DOB-approved machine manufacturer's training for the specific make and model of mini crane.

26.     Similarly, safety regulations required Western Specialty Contractors, as the employer, to make sure the Jekko mini crane operator had received training on the specific make and model of mini crane, and that the mini crane was not overloaded.

27.     After ordering the Jekko mini crane, Braico and Edwards requested ironworkers from the Local 580 Ironworkers Union ("Local 580"), without informing Local 580 that the workers would be using a Jekko MPK20W+ mini crane to hoist the panels. Because Braico and Edwards did not mention the Jekko mini crane, Local 580 did not send ironworkers trained and certified to operate it.

5

28.     During the week of June 18, 2018, Edwards, under Braico's supervision, directed the Local 580 ironworkers to use the Glazier rig 2200 to hoist the glass and steel panels. The Glazier rig 2200 was tied off to keep it from falling off the side of the concrete deck.

29.     On or about June 20, 2018, Western's expediter sent Braico and Edwards an email, stating in substance that they needed the "Alt 2" permit, including engineer's drawings, to use a particular model of a Jekko mini crane.

30.     On or about June 21, 2018, the Local 580 business agent went to the Project to "walk the job." When Edwards told the Local 580 business agent that Western was planning to use a Jekko mini crane to hoist the panels, the business agent forcefully told Edwards that Edwards and Braico had never told him that they were going to use a Jekko, that none of the men he had sent to the site were certified to operate a Jekko, and that they should not use the Jekko. The business agent further told Edwards that he would send a Jekko-trained worker the following Wednesday, June 27, 2018, to operate the mini crane, after the worker had attended a Jekko training at the Local 580 union hall scheduled for the following Tuesday. Edwards replied that he "had it covered."

31.     On or about June 22, 2018, the rental company delivered the Jekko mini crane to the Project worksite. Despite the business agent's strong warning, and in violation of DOB and applicable safety rules, Edwards assigned an uncertified ironworker to operate the Jekko mini crane, assuring the ironworker that the Jekko mini crane did not need to be tied off.

32.     Also on or about June 22, 2018, during a meeting with Braico, Edwards and a Western engineer, the Western regional manager with authority over the Facades Division was falsely informed that Braico and Edwards were in the process of obtaining the necessary DOB permit for the Jekko mini crane.

## JUNE 25, 2018

33.     Western owed a duty to both Gotham and ZDG, independent of any contract to, among other things:

   a.  Follow the law, including DOB regulations;

   b.  Refrain from using untrained and uncertified workers to operate cranes;

   c.  Not operate cranes without required permits; and

   d.  Refrain from operating any crane with an unbalanced load or a load in excess of the crane's capacity.

34.     On or about June 25, 2018, Edwards directed the uncertified ironworker to begin using the Jekko mini crane to hoist the panels; the Jekko mini crane was positioned on the fourth floor, without any tie offs, and with its boom extended straight out to a length of seven feet; a metal bar was attached to the panel to keep it level; in violation of DOB and applicable safety rules, no engineer or certified Jekko operator had calculated whether or in what configuration the Jekko mini crane could lift the weight of the panels.

35.     In fact, as positioned, the Jekko mini crane had a load limit of approximately 880 pounds; a glass and metal panel alone weighed approximately 1322 pounds, and with the metal bar attached, the total weight was approximately 1500 pounds.

36.     Below the Jekko mini crane, ironworkers were positioned on the second floor to guide the bottom of the panels into place and on the third floor to "marry" the tops of the panels.

37.     At first, as the Jekko mini crane lifted a glass and metal panel up from its flat position on the second floor, the second floor workers carried part of the panel's weight, guiding it up.  When the panel was vertical, the workers gave it a push so that it cleared the concrete deck, putting all the panel weight on the Jekko mini crane. Overloaded and unsecured, the Jekko mini crane fell forward, and the boom reached in to the third floor, grabbing ironworker

7

Christopher Jackson and flinging him to the ground. The boom also hit ironworker Jorge Delgado in the back, pushing him further into the building. Had the mini crane been tied off as required, it would not have fallen over. First responders transported both injured workers to Harlem Hospital for treatment. Mr. Jackson suffered severe trauma to his head which affected his ability to speak and to walk. Mr. Delgado was struck in the back, and suffered severe spinal injuries impairing his ability to walk and move.

38.     The accident not only caused personal injuries but also damaged panels and surrounding property and resulted in the loss of use of the Premises and the Project resulting from, *inter alia,* the personal injuries and property damage.

39.     As a result of the above described events and the abrupt cataclysmic occurrences of June 25, 2018, and the resulting personal injuries and property damage, the DOB issued several violations and stop work orders and inter alia ordered the cessation of all activities at the Premises involving lifting or hoisting, effectively stopping all work on the Project.

40.     Braico and Edwards, through their negligent, grossly negligent, or reckless acts and omissions, for which Western is liable, set into motion a chain of events that resulted in the abrupt cataclysmic occurrences of June 25, 2018, serious physical injury to Christopher Jackson and Jorge Delgado, physical damage to the Premises and the Project (including loss of use), and extensive cost overruns and delays.

41.     Western, through its breaches of the Subcontract and its negligent, grossly negligent, or reckless acts and omissions, set into motion a chain of events that resulted in the abrupt cataclysmic occurrences of June 25, 2018, serious physical injury to Christopher Jackson and Jorge Delgado, physical damage to the Premises and the Project (including loss of use), and extensive cost overruns and delays.

8

42.     The cost overruns resulting from the abrupt cataclysmic occurrences of June 25, 2018, and the actions and inactions of Western and its agents and representatives, included but were not limited to costs to repair or replace damaged work, costs to replace Western with another subcontractor to perform Western's scope of work, and costs due to delay and efforts to mitigate delay, and were caused by, *inter alia*, the abrupt cataclysmic occurrences of June 25, 2018, and the resulting personal injury and property damage.

43.     In addition to the foregoing, certain portions of the work performed by Western under the Subcontract prior to the termination thereof were defective and required remedial work and/or replacement.

44.     By letter to Western dated July 13, 2018, ZDG declared Western to be in default of its obligations under the Subcontract and demanded that Western take action to cure such default.

45.     By letter to Surety dated July 13, 2018, ZDG advised Surety that ZDG had declared Western to be in default of its obligations under the Subcontract and demanded that Surety perform and complete Western's obligations under the Subcontract within the time required thereunder, in accordance with the terms of the Bond.

46.     By letter to Western dated August 9, 2018, with a copy to Surety, ZDG declared Western to be in continued default of the Subcontract and terminated Western's employment under the Subcontract for cause in accordance with the provisions thereof, and demanded that Surety advise the manner in which Surety intended to promptly and fully discharge its obligations within the time constraints set forth in the Bond.

47.     In breach of the terms of the Bond, Surety has taken no steps to remedy the default of Western or to complete the Subcontract.

DM1\9986472.1

## FIRST CAUSE OF ACTION AGAINST WESTERN – BREACH OF CONTRACT

48.     Plaintiffs repeat and reallege the allegations set forth in paragraphs "1" through "47" hereof with the same force and effect as if fully set forth at length herein and hereby incorporate the same by reference herein.

49.     The actions and omissions of Western and its agents and representatives set forth above were a material breach of the terms of the Subcontract.

50.     As a result of the breaches of the Subcontract by Western and its agents and representatives, ZDG and Gotham were damaged in a sum to be proved at trial but believed to be in excess of $37,147,349.00, no part of which has been paid.

## SECOND CAUSE OF ACTION AGAINST WESTERN – NEGLIGENCE

51.     ZDG and Gotham repeat and reallege the allegations set forth in paragraphs "1" through "50" hereof with the same force and effect as if fully set forth at length herein and hereby incorporate the same by reference herein.

52.     Western and its agents and representatives owed a duty to ZDG and Gotham to perform Western's work in a safe manner.

53.     Western and its agents and representatives owed a duty to ZDG and Gotham to perform Western's work in accordance with all applicable laws, codes, ordinances, and rules.

54.     Western and its agents and representatives owed a duty to ZDG and Gotham to obtain all appropriate and necessary approvals, permits, and licenses for all equipment used to perform Western's work, including but not limited to cranes, hoists, and other lifting equipment.

55.     Western and its agents and representatives owed a duty to ZDG and Gotham to utilize properly trained, licensed, and permitted operators for all equipment used to perform Western's work including but not limited to cranes, hoists, and other lifting equipment.

10

56.     The foregoing duties were independent of and separate from the duties imposed by the Subcontract.

57.     The acts and omissions of Western and its agents and representatives set forth above were a breach of the above duties owed to ZDG and Gotham.

58.     The acts and omissions of Western and its agents and representatives set forth above constitute negligence and resulted in the abrupt cataclysmic occurrences of June 25, 2018.

59.     As a result of the negligence by Western and its agents and representatives, ZDG and Gotham were damaged in a sum to be proved at trial but believed to be in excess of $37,147,349.00, no part of which has been paid.

**THIRD CAUSE OF ACTION AGAINST WESTERN – GROSS NEGLIGENCE**

60.     ZDG and Gotham repeat and reallege the allegations set forth in paragraphs "1" through "59" hereof with the same force and effect as if fully set forth at length herein and hereby incorporate the same by reference herein.

61.     Western and its agents and representatives owed a duty to ZDG and Gotham to perform Western's work in a safe manner.

62.     Western and its agents and representatives owed a duty to ZDG and Gotham to perform Western's work in accordance with all applicable laws, codes, ordinances, and rules.

63.     Western and its agents and representatives owed a duty to ZDG and Gotham to obtain all appropriate and necessary approvals, permits, and licenses for all equipment used to perform Western's work, including but not limited to cranes, hoists, and other lifting equipment.

64.     Western was specifically reminded of this duty by its permit expeditor on June 20, 2018.

11

65.     Western and its agents and representatives owed a duty to ZDG and Gotham to utilize properly trained, licensed, and permitted operators for all equipment used to perform Western's work including but not limited to cranes, hoists, and other lifting equipment.

66.     Western was specifically reminded of this duty by the Local 580 business agent on June 21, 2018 when it was forcefully told by the Local 580 business agent not to operate the Jekko crane until a Jekko-trained worker was sent to the project site.

67.     The acts and omissions of Western and its agents and representatives set forth above by failing to adhere to the warnings of its expeditor and the Local 580 business agent demonstrate reckless indifference to the rights of others constituting gross negligence and/or recklessness, and resulted in the abrupt cataclysmic occurrences of June 25, 2018.

68.     As a result of the gross negligence by Western and its agents and representatives, ZDG and Gotham were damaged in a sum to be proved at trial but believed to be in excess of $37,147,349.00, no part of which has been paid. Additionally, based upon the conduct of Western and its agents and representatives, ZDG and Gotham seek punitive damages against Western in a sum to be determined at trial.

## FOURTH CAUSE OF ACTION AGAINST SURETY – BREACH OF CONTRACT

69.     ZDG and Gotham repeat and reallege the allegations set forth in paragraphs "1" through "49" hereof with the same force and effect as if fully set forth at length herein and hereby incorporate the same by reference herein.

70.     Surety breached the terms and conditions of the Bond by, inter alia, failing and refusing to commence performance and completion of Western's obligations under the Subcontract within thirty (30) days of notice to Surety of a declaration of default on the part of Western, and to perform and complete the same within the time required under the Subcontract.

DM1\9986472.1

71.     Surety additionally breached the terms and conditions of the Bond by failing and refusing to treat its obligation to complete the Subcontract as absolute and failing and refusing to defer until a later date the disposition of any dispute relating to the performance of the Subcontract without interference in, or with the performance of, the Subcontract.

72.     As a result of the breaches of the terms and conditions of the Bond by Surety, ZDG and Gotham have been damaged in a sum to be proved at trial but believed to be in excess of $37,147,349.00, no part of which has been paid.

**WHEREFORE**, Plaintiffs BDG Gotham Residential, LLC and ZDG, LLC demand judgment:

1.     On their First Cause of Action, against Defendant Western Waterproofing Company, Inc., d/b/a Western Specialty Contactors, in an amount to be proved at trial but believed to be in excess of $37,147,349.00, together with interest thereon;

2.     On their Second Cause of Action, against Defendant Western Waterproofing Company, Inc., d/b/a Western Specialty Contactors, in an amount to be proved at trial but believed to be in excess of $37,147,349.00, together with interest thereon;

3.     On their Third Cause of Action, against Defendant Western Waterproofing Company, Inc., d/b/a Western Specialty Contactors, in an amount to be proved at trial but believed to be in excess of $37,147,349.00, plus punitive damages, together with interest thereon;

4.     On their Fourth Cause of Action, against Defendant Western Surety Company in an amount to be proved at trial but believed to be in excess of $37,147,349.00, together with interest thereon; and

5.     For such other and further relief as the Court may deem just and proper.

13

Dated: New York, New York
       September 19, 2019

DUANE MORRIS LLP
Attorneys for Plaintiff *BDG GOTHAM RESIDENTIAL, LLC*

By: _____
       Kenneth Lazaruk, Esq.
       John S. Wojak, Jr., Esq.
1540 Broadway
New York, NY 10036
(212) 692-1000

PECKAR & ABRAMSON, P.C.
Attorneys for Plaintiff *ZDG, LLC*

By: _____
       Gregory H. Chertoff, Esq.
1325 Avenue of the Americas, 10th Floor
New York, New York 10019
(212) 382-0909

DM1\9986472.1