USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  9/30/2024

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BDG GOTHAM RESIDENTIAL, LLC, et al.,

          Plaintiffs,

     -against-

WESTERN WATERPROOFING COMPANY,
INC., et al.,

          Defendants.

19-CV-6386 (BCM)

**OPINION AND ORDER**

**BARBARA MOSES, United States Magistrate Judge.**

Defendant Western Waterproofing Company, Inc. (Western) was installing a façade on a new mixed-use building in upper Manhattan on June 25, 2018, when its employees overloaded a mini crane, causing it to fall four stories, seriously injuring two workers and resulting in an immediate stop-work order that delayed the construction of the building. The project owner, BDG Gotham Residential, LLC (BDG), and its construction manager, ZDG, LLC (ZDG), brought this action against Western and its surety, Western Surety Company (the Surety), to recover damages caused by the delay. Plaintiffs seek sixty categories of damages, amounting to approximately $20.1 million, on theories of breach of contract, negligence, and gross negligence.

Now before the Court is plaintiffs' motion (Dkt. 194) seeking summary judgment as to liability against Western on their claims for breach of contract and negligence,[1] and against the Surety for beach of its $3.41 million bond securing Western's performance. Also before the Court is defendants' cross-motion (Dkt. 203) seeking summary judgment as to plaintiffs' negligence and gross negligence claims – which, defendants contend, are duplicative of the contract claim – and as to eighteen categories of claimed damages, amounting in the aggregate to $15.4 million.

---

[1] Plaintiffs do not seek summary judgment on their gross negligence claim. *See* Pl. Mem. (Dkt. 197) at 1 n.1.

Both motions will be granted in part and denied in part. Plaintiffs are entitled to summary judgment as to liability on their breach of contract claims against Western and the Surety. However, defendants are entitled to summary judgment on plaintiffs' negligence claim, because it is not based on any non-duplicative injury and does not seek any non-duplicative compensatory damages, and on the gross negligence claim, because the conduct constituting Western's breach of contract was not part of a pattern of similar conduct directed at the public generally. Defendants are also entitled to summary judgment as to seventeen categories of damages, amounting in the aggregate to approximately $14.5 million, in most instances because plaintiffs cannot point to any admissible evidence in the record demonstrating the existence of the damages sought, the amount of those damages, or both. That leaves forty-three categories of damages, valued by plaintiffs at approximately $5.6 million, for trial.

## I.    BACKGROUND

The facts set forth below are drawn primarily from the parties' Joint Statement of Undisputed Facts (SUF) (Dkt. 195) and the 2,206 pages of exhibits attached thereto. Facts drawn from other portions of the record are undisputed unless otherwise noted.

### A.    The Parties and the Project

On September 1, 2016, plaintiff BDG, as Owner, and plaintiff ZDG, as Construction Manager, entered into a Construction Management Agreement (the CMA) to build an 11-story mixed-use building on East 126th Street in Manhattan (the Project), with commercial space on the ground floor and apartments above. SUF ¶ 2 & Ex. 1 (Dkts. 195-1 to 195-2). The Project Schedule annexed to the CMA as Exhibit D (Dkt. 195-1 at ECF p. 90 to Dkt. 195-2 at ECF p. 8) called for the building's façade – referred to as a "curtainwall" – to be installed in approximately three months beginning in June 2017, with all construction to conclude in October 2018.

On April 11, 2017, ZDG entered into a Subcontractor Agreement (the Subcontract) with Western, a masonry, concrete, and façade installation and restoration company, for work on the Project. SUF ¶¶ 3-4 & Ex. 2 (Dkts. 195-3 to 195-5). BDG is a third-party beneficiary of the Subcontract, which is governed by New York law. SUF ¶ 25; Subcontract §§ 25.15(b), 28.1. Pursuant to the Scope of Work made a part of the Subcontract, Western was responsible for installing (but not designing or fabricating) the curtainwall, for which it was to be paid $3.41 million. SUF ¶ 42; Subcontract ¶ 5.1(a) & Ex. A (Dkt. 195-4 at ECF pp. 12-15). As required by the Subcontract, Western and the Surety executed a Performance Bond and a Payment Bond (together, the Bonds) in the penal sum of $3.41 million, to secure Western's performance. SUF ¶¶ 5-6 & Ex. 3 (Dkt. 195-8). The Bonds name both ZDG and BDG as obligees. *Id.*

## B.    Installation of the Curtainwall

The building's façade was to consist of approximately 1,100 curtainwall panels made in Italy by Giugiaro Architettura & Structures S.p.A (Giugiaro). SUF ¶¶ 40-42. After substantial fabrication and delivery delays, the first panels arrived in May 2018. *Id.* ¶ 43. Some of the panels were metal; others were metal and glass. *Id*. ¶ 77. ZDG emailed Giugiaro's final shop drawings to Western on June 8, 2018, and held a curtainwall installation "kickoff meeting" three days later. *Id.* ¶¶ 44, 45. Although Project specifications provided that no panels could be installed until the shop drawings were approved by the Project architect – which did not happen until July 27, 2018 – BDG emailed ZDG on June 15, 2018, reporting that it "expected" Western "to have at least 3 panels installed by end of the day today" (which did not happen) and noting that the Subcontract called for Western to "install a floor every ten days." *Id.* ¶¶ 46-48, 51. BDG then instructed ZDG, "We need you to push [Western] hard, fast, and now," because "[w]e can't accept any more contractor delays on this project." *Id.* ¶ 51.

Using union ironworkers, Western installed the first curtainwall panel, on the second floor of the north elevation, on Monday, June 18, 2018. SUF ¶ 52, 56. However, Western installed a total of only eight panels that week, using a mechanical hoist to lift and position them. *Id*. ¶ 52, 57. Following a June 19, 2018 meeting among BDG, ZDG, and Western, ZDG consulted with Giugiaro regarding installation of the panels. *Id.* ¶ 53-55. A representative of Giugiaro emailed ZDG on June 20, stating that "the complexity of this facade requires much more equipment (. . . and capable people, for sure)" than Western had provided up to that point, adding that with only "a small laser, a level a foot long and a meter of wood and not even a proper crane[,] [t]his is really becoming a very dangerous game. They will get hurt and will hurt others[.]" *Id.* ¶ 55.

Timothy Braico was the senior branch manager of Western's Façades Division, and was responsible for adhering to applicable Occupational Safety and Health Administration (OSHA) and New York City Department of Buildings (DOB) safety rules and regulations. SUF ¶ 58-59. On June 20, 2018, Braico ordered a Jekko MPK20W+ mini crane (the Jekko) from an equipment rental company for use at the Project. *Id.*[2] Terrence Edwards was a curtainwall superintendent for the Façades Division, reporting to Braico. *Id*. ¶ 60. On June 21, Edwards advised ZDG that "Western will be using 2 [Jekkos] for setting and lay down of glass panels." *Id.* ¶ 61.

Western did not obtain any permits to use the Jekko on the Project, did not engage a licensed engineer to prepare plans for using the Jekko, and "did not have an operator who had successfully completed a DOB-approved machine manufacturer's training for the Jekko." SUF ¶¶ 66, 68, 70. A union representative who visited the site on June 21, 2018 informed Edwards that the union would arrange for an ironworker to receive offsite training for the Jekko on Tuesday,

---

[2] A Jekko MPK20 mini crane is a 2-ton powered hoist with a telescoping boom arm that can extend 10 feet horizontally, and reach a maximum vertical height of approximately 16 feet. (Dkt. 196-6 at 7-8.)

June 26, and return to the site to operate the machine on June 27. SUF ¶ 74-75. The representative instructed Western not to use the Jekko before that date because none of the ironworkers were qualified or licensed to operate the machine. *Id.*

The first Jekko was delivered on Friday, June 22, 2018. SUF ¶ 62. The ironworkers used it that day to remove panels from their shipping crates and place them on dollies so that they would be ready for installation on Monday, June 25. *Id.* A video, submitted by plaintiffs, shows this operation in progress. *See* Declaration of Stephen Lewis (Lewis Decl.) (Dkt. 196-10) ¶¶ 10-12 & Ex. A (video). The Jekko can be seen – and heard – in the video, emitting a high-pitched beep as it takes the weight of the panel. Lewis (one of the ironworkers) then comments, "too much weight!" and laughs.

### C.    The Accident

On Monday, June 25, 2018 – before any of the ironworkers received offsite training for the Jekko – Western used the crane to successfully install one all-metal curtainwall panel on the second floor. SUF ¶¶ 76-78. Western then attempted to hoist the next panel – which was a metal/glass panel, and therefore heavier – into position. *Id.* ¶¶ 77-79. The Jekko was positioned on the fourth floor, with its boom arm projecting out, over the edge of the slab, and was not tied off. SUF ¶ 78 & Ex. 19 (Dkt. 195-26) (photo taken June 25, 2018). Gideon Kipperman, the ZDG employee who took the photo, testified at deposition that "he saw an orange light on the machine and heard a solid beep." SUF ¶ 82.

The ironworker who operated the Jekko that day – Lewis – had received "approximately 15 minutes of training" the previous Friday, June 22, 2018, but had not completed a DOB-approved training course. SUF ¶ 72. As Lewis operated the Jekko on the fourth floor, other ironworkers were positioned on the third and second floors, to guide the panel into place. SUF ¶ 78-79; Lewis Decl.

Ex. B (video). The panel itself was on the second floor. Lewis Decl. Ex. B. While lifting the panel, the Jekko toppled forward over the edge of the fourth-floor slab, bounced off the third floor, and fell to the ground, pulling one ironworker with it and striking another, leaving both seriously injured. Lewis Decl. Ex. B; *see also* SUF ¶ 80 & Ex. 17 (Dkt. 195-24) (Western accident report). The accident also caused damage to the panel and the surrounding area. *Id.* ¶ 80.

On June 25, 2018, the DOB issued a Stop Work Order. SUF ¶ 88 & Ex. 24 (Dkt. 195-31) (stop work documents). Although the order was partially rescinded on July 16, 2018, allowing trades to return to work, hoisting activities that required a permit remained prohibited until the Stop Work Order was fully rescinded on October 4, 2018. SUF ¶¶ 89-90.

By letter dated July 13, 2018, ZDG declared Western in default of its obligations under the Subcontract and demanded that it take action to cure such default. SUF ¶ 93 & Ex. 28 (Dkt. 195-35) (letter to Western). That same day, ZDG notified the Surety of the declaration of default against Western, SUF ¶ 94, and demanded that the Surety complete the Subcontract within the time required thereunder, in accordance with the Performance Bond. SUF ¶ 94 & Ex. 29 (Dkt. 195-36) (letter to Western Surety). However, on September 13, ZDG notified the Surety that it was directly retaining PPA Holding Corp. (PPA), as a completion contractor, to finish the installation of the curtainwall. Def. 56.1 St. (Dkt. 204) ¶ 158 & Ex. 102 (Dkt. 204-2) (email). PPA agreed to a price of $2.9 million, which was approximately $300,000 *less* than the unpaid balance on the Western Subcontract. Def. 56.1 St. ¶ 160 & Ex. 120 (Dkt. 204-20) (PPA subcontract).

### D.    Other Proceedings

The DOB issued multiple summonses to Western relating to the accident, SUF ¶ 97,

resulting in civil penalties totaling $100,000. *Id*. ¶ 98.[3] ZDG was also assessed multiple civil penalties. *Id*. ¶¶ 99-100. Additionally, Western received OSHA citations, *id*. ¶ 101, and the New York County District Attorney (DANY) opened a criminal investigation into the accident. *See BDG Gotham Residential, LLC v. W. Waterproofing Co., Inc.*, 631 F. Supp. 3d 76, 79 (S.D.N.Y. 2022) (*BDG Gotham II*). On November 8, 2018, Western entered into a deferred prosecution agreement (DPA) with the DANY, pursuant to which it accepted "responsibility for the conduct of [Braico and Edwards] with regard to the untethered, overloaded use of a Jekko MPK20W+ mini crane, by an uncertified operator, [. . .] , in violation of DOB and applicable safety rules[.]" *Id*. (first alteration in original). Western's acceptance of responsibility in the DPA is admissible, in this action, as a party admission. *Id*. at 81-84.[4]

### E.    Procedural History

Plaintiffs filed their initial Complaint (Dkt. 1-3) in state court on June 4, 2019. Defendants removed the action on July 10, 2019, invoking this Court's diversity jurisdiction. (Dkt. 1.) On September 20, 2019, plaintiffs filed an Amended Complaint (Am. Compl.) (Dkt. 28) seeking damages against Western for breach of contract, negligence, and gross negligence, and against the Surety for breach of the Performance Bond.

---

[3] During an evidentiary hearing before New York City's Office of Administrative Trials and Hearings (OATH), a DOB inspector testified that the Jekko's maximum capacity, at the angle at which it was being used to lift the panels, was approximately 800 pounds, "but the [panels] were over 1200 lbs." *See* SUF Ex. 32 (Dkt. 195-39) (OATH decision) at 2. The hearing officer found Western in violation of four summonses after determining, among other things, that it "did not follow the regulatory requirements when operating the MPK20," that it failed to "institute and maintain safety measures at the construction site that was in close proximity to the public," and that the crane operator, Lewis, "was not qualified to operate the machine." *Id*. at 2-3.

[4] The existence of the criminal investigation as to Western, however, and the fact that its admission was made in a DPA, will not be revealed to the jury. *BDG Gotham II*, 631 F. Supp. 3d at 81.

### 1.    Pleading Motions

On October 18, 2019, the Surety moved to dismiss plaintiffs' claims against it to the extent plaintiffs sought to recover more than the $3.41 million penal sum of the Performance Bond. (Dkt. 35.) On the same day, Western moved to dismiss plaintiffs' negligence and gross negligence claims, under the "principle that plaintiffs cannot recover in tort for purely economic losses caused by a defendant's alleged negligence." (Dkt. 34 at 4.) On November 20, 2020, the Hon. Alison J. Nathan, to whom this case was then assigned, granted the Surety's motion but denied Western's. After "accept[ing] as true all allegations in the complaint and draw[ing] all reasonable inferences" in plaintiffs' favor, *BDG Gotham Residential, LLC v. W. Waterproofing Co., Inc.* (*BDG Gotham I*), 2020 WL 6825679, at *2 (S.D.N.Y. Nov. 20, 2020) (*BDG Gotham I*), Judge Nathan held that under the circumstances alleged, "the existence of a contract with Western Waterproofing does not preclude [tort] liability," *id.* at *4, and that plaintiffs "adequately alleged gross negligence" as well as ordinary negligence. *Id.* at *4-5.

On February 22, 2022, while discovery was ongoing, Judge Nathan referred this action to the undersigned Magistrate Judge for pretrial management. (Dkt. 90.)

### 2.    Expert Reports

The parties agree that the accident "caused delay to the Project," but "dispute the amount of the delay and the resulting damages." SUF ¶ 102. Plaintiffs served their primary (and only) affirmative expert report, prepared by Joseph Wallwork on behalf of Nautilus Consulting, LLC (the Wallwork Report), on May 12, 2023. SUF Ex. 36 (Dkt. 195-43). Wallwork opined that Western's "delays and failure to perform" caused 185 consecutive calendar days (CCDs) of delay, while Giugiaro caused 387 CCDs of delay, and other entities caused 99 CCDs of delay, for a total of 671 CCDs of delay. Wallwork Rep. at 2-3, 51, 76. He further opined that plaintiffs incurred

approximately $20.4 million in additional costs and other damages "due to Western." *Id*. at 3, 75-76. In Wallwork's view, some of the claimed damages "are due solely to Western while others are shared and must be allocated to the parties that caused the project delays." *Id*. at 52. On most of the shared claims, Wallwork allocated 27.6% (185/671) of the total to Western. *Id*. at 53.

The largest single item of damages described in the Wallwork Report is approximately $5.1 million in "lost revenue," that is, rental income that BDG did not earn because the Project was not completed on time. Wallwork Rep. at 67-68; *see also* Pl. Damage Chart, Wallwork Rep. Att. 3 (Dkt. 195-49). Beyond explaining that $5.1 million is 27.6% of $18.5 million, however, Wallwork provided no detail or backup data for this calculation. Other components of Wallwork's damages analysis were similarly unexplained and unsupported. For example, Wallwork opined that plaintiffs lost approximately $1.6 million (of which 27.6% was attributable to Western) because the Project was not finished in time to be featured on a cable TV show called "Million Dollar Listing," which "would have provided significant free advertising and [a] sales boost." Wallwork Rep. at 67; *see also* Pl. Damage Chart at 1-2. But he failed to provide any support for his premise, which was that $1.6 million was "equal to the cost" of an equivalent "nationally shown TV commercial." *Id*.

On August 4, 2023, plaintiffs moved, belatedly, for an extension of their already-expired deadline for serving affirmative expert reports, so that they could prepare and serve "two additional expert reports" in September. (Dkt. 171 at 1.) I denied that motion. (Dkt. 173.) Defendants timely served their own expert report, prepared by Arcadis U.S., Inc. (the Arcadis Report), on August 11, 2023. SUF ¶ 104 & Ex. 38 (Dkt. 195-45). Arcadis concluded that Western was only responsible for 39 days of delay, and that plaintiffs' maximum recoverable damages are approximately $200,000. Arcadis Rep. at 31, 50. One of the reasons the Arcadis figure is so low is that Arcadis

pronounced itself unable to evaluate many of the items contained in the Wallwork Report, because plaintiffs failed to provide "sufficient documentation." *Id*. at 49.

On September 15, 2023, plaintiffs served a "rebuttal" expert report, also prepared by Wallwork (the Wallwork Rebuttal), which attached over 6,800 pages of backup data and documents, including 2,292 pages never previously produced in discovery. SUF ¶ 103 & Ex. 37 (Dkt. 195-44). With respect to plaintiffs' "lost revenue" claim however, Wallwork still did not provide any calculations or backup data of his own. Instead he attached an entirely new, 77-page page expert report authored by Rebecca Fitzhugh (the Fitzhugh Report) (Dkt. 176-2), which opined that plaintiffs' lost rental profits attributable to the delay caused by Western were approximately $5.1 million. Fitzhugh relied, in turn, on a two-page letter-opinion by Stephen G. Kliegerman (the Kliegerman Report) (Dkt. 176-2 at ECF pp. 58-59), asserting that the Project's apartments would have rented at a substantial premium to market rates in the neighborhood. Fitzhugh also reviewed the (new) documentation produced to support other components of Wallwork's (original) damages estimate, and concluded that approximately $18.5 million (of the $20.4 million claimed in the original Wallwork Report) were "supported by documentation provided by the parties." Fitzhugh Rep. at 5. Wallwork himself then revised his total damages calculation downward by approximately 1%, to $20,169,845.25, based on the "vetting" performed by Fitzhugh. Wallwork Rebuttal at 1, 43.

Defendants moved to preclude plaintiffs from introducing or relying on the Fitzhugh Report, the Kliegerman Report, or any backup documents that were not attached to Wallwork's original report or – at a minimum – produced in discovery. (Dkts. 174, 176.) In a Preclusion Order dated November 29, 2023 (Dkt. 187), I granted that motion in substantial part, precluding plaintiffs from introducing or relying on the Fitzhugh Report or the Kliegerman Report, *see* Preclusion Order

at 12, and excluding from evidence the other data and documents produced for the first time with the Wallwork Rebuttal. *See id.* at 17. Additionally, I precluded plaintiffs from offering testimony concerning the excluded material, whether through Wallwork or "any of plaintiffs' other witnesses." *Id.*; *see also id.* at 19 ("That means that the documents themselves may not be offered in evidence, and neither Mr. Wallwork nor any other witness may rely on them, or their contents, 'on a motion, at a hearing, or at trial[.]'") (quoting Fed. R. Civ. P. 37(c)(1)).[5] Plaintiffs did not object to the Preclusion Order pursuant to Fed. R. Civ. P. 72(a).

Discovery closed on January 4, 2024, after Wallwork sat for an expert deposition. (*See* Dkt. 190.)

### 3.    Summary Judgment Motions

On February 26, 2024, plaintiffs filed their summary judgment motion, supported by their memorandum of law, the Joint Statement of Undisputed Facts, and (separately) plaintiffs' statement of additional undisputed material facts, submitted pursuant to Local Civil Rule 56.1 (Pl. 56.1 St.) (Dkt. 196), attaching another 116 pages of exhibits. On March 25, 2024, defendants filed their opposition and cross-motion for summary judgment, supported by a memorandum of law (Def. Mem.) (Dkt. 205) and their own Local Civil Rule 56.1 statement, attaching 294 pages of exhibits.

On April 22, 2024, plaintiffs filed a reply memorandum (Pl. Reply Mem.) (Dkt. 208), supported by the declaration of John S. Wojak (Wojak Decl.) (Dkt. 210), attaching 862 pages of

---

[5] The Court made a narrow exception for recent loan statements and invoices offered to support plaintiffs' calculations of expenses that continue to accrue over time – "specifically, interest on loans, and fees owed to lawyers[.]" Preclusion Order at 19-20 (permitting plaintiffs to rely on statements and invoices "from January 1, 2022, forward," even if they were not previously produced, "so long as they merely update the amounts paid or owed, over time, on previously-disclosed loans or legal engagements").

exhibits, and a response to defendants' Local Civil Rule 56.1 statement (Pl. Resp. 56.1 St.) (Dkt. 209). Lastly, on May 20, 2024, defendants filed their reply memorandum (Def. Reply Mem.) (Dkt. 215), supported by the declaration of Steven H. Rittmaster (Dkt. 214), attaching an 8-page exhibit.

On March 15, 2024, the parties consented to my jurisdiction pursuant to 28 U.S.C. § 636(c) (Dkt. 200), and the case was reassigned to me for all purposes.

## II.    LEGAL STANDARDS

A court may grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The moving party bears the initial burden of informing the court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine dispute as to any material fact. Fed. R. Civ. P. 56(c); *Celotex*, 477 U.S. at 323. "On a motion for summary judgment, a fact is material if it 'might affect the outcome of the suit under the governing law.'" *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). If the moving party satisfies its initial burden, the burden shifts to the non-moving party to establish, through admissible evidence, a genuine dispute of material fact sufficient to prevent the entry of judgment against it. *Celotex*, 477 U.S. at 323-24; *Santos v. Murdock*, 243 F.3d 681, 683 (2d Cir. 2001). A dispute of material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also id*. at 249 ("there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party").

In this District, a party moving for summary judgment must submit a statement, in numbered paragraphs, setting forth "the material facts as to which [it] contends there is no genuine

issue to be tried." Loc. Civ. R. 56.1(a). The opposing party must specifically controvert each numbered paragraph in a corresponding paragraph of its own. Loc. Civ. R. 56.1(b). If the opposing party fails to do so, that paragraph is deemed admitted. Loc. Civ. R. 56.1(c).

Summary judgment is a flexible tool for streamlining a case before trial. It may be requested "not only as to an entire case but also as to a claim, defense, or part of a claim or defense." Fed. R. Civ. P. 56, advisory committee's note to 2010 amendment. Similarly, even if the court "does not grant all the relief requested by the motion, it may enter an order stating any material fact – including an item of damages or other relief – that is not genuinely in dispute and treating the fact as established in the case." Fed. R. Civ. P. 56(g). Thus, "partial summary judgment" (which does not involve the entry of an appealable final judgment) functions as "a pretrial adjudication that certain issues shall be deemed established for the trial of the case," which "serves the purpose of speeding up litigation by eliminating before trial matters wherein there is no genuine issue of fact." Fed. R. Civ. P. 56, advisory committee's note to 1946 amendment. Accordingly, a court may grant partial summary judgment with respect to liability on a claim without granting summary judgment as to damages. *See, e.g.*, *Lee v. Kucker & Bruh, LLP*, 958 F. Supp. 2d 524, 532 (S.D.N.Y. 2013); *Int'l Knitwear Co. v. M/V ZIM CANADA*, 1994 WL 924203, at *6 (S.D.N.Y. Oct. 6, 1994).

The court may also grant partial summary judgment to "eliminat[e] elements of damages before trial[.]" *Hamblin v. Brit. Airways PLC*, 717 F. Supp. 2d 303, 308 (E.D.N.Y. 2010) (concluding that "the word 'claim' in Rule 56 is not limited to the theory of liability that a plaintiff asserts," and ruling that a plaintiff traumatized by a crash landing could not seek damages from the airline flowing from the later termination of his employment); *see also, e.g.*, *Ehrlich v. Am. Airlines, Inc.*, 360 F.3d 366, 401 (2d Cir. 2004) (affirming grant of partial summary judgment to defendant on plaintiffs' claim for "compensatory damages for their mental injuries"); *Hart v. Rick's*

*Cabaret Int'l, Inc.*, 60 F. Supp. 3d 447, 479 (S.D.N.Y. 2014) (granting summary judgment to plaintiffs on certain categories of unpaid wages, while leaving other categories of claimed damages to be "resolved at trial"). Summary judgment as to a specific category of damages is particularly appropriate where the question is "whether there is sufficient evidence to raise a factual issue for the jury to resolve." *Hamblin*, 717 F. Supp. 2d at 307.

## III.    DISCUSSION

### A.    Breach of Contract - Western

Because Western concedes that it is liable to plaintiffs for breach of contract, *see* Def. Mem. at 38, plaintiffs are entitled to partial summary judgment with respect to liability on that claim. However, as plaintiffs note, "[t]he amount of damages due to Plaintiffs [from Western] for this breach will be an issue for the jury at trial." Pl. Reply Mem. at 1.

### B.    Breach of Contract - Surety

Plaintiffs also seek summary judgment as to liability against the Surety, for breach of the Performance Bond. Pl. Mem. at 23-24. In that instrument, the Surety agreed that "whenever [Western] shall be declared by [ZDG and/or BDG] to be in default, Surety may remedy the default *or* may perform fully and complete the obligations of [Western]" under the Subcontract. Performance Bond at ECF p. 2 (emphasis added). This language gave the Surety "two options." *Granite Computer Leasing Corp. v. Travelers Indem. Co.*, 894 F.2d 547, 551 (2d Cir. 1990). "First, the surety may undertake to complete the principal's work itself; this obligation may be satisfied by the surety funding the principal to complete its work. Second, the surety has the option of paying the obligee under the bond its damages, essentially the obligee's cost of completion." *Id*. (citations omitted); *accord U.S. Fid. & Guar. Co. v. Braspetro Oil Servs. Co.*, 369 F.3d 34, 66 (2d Cir. 2004); *United States v. Seaboard Sur. Co.*, 817 F.2d 956, 959 (2d Cir. 1987).

It is undisputed that ZDG declared Western in default on July 13, 2018, and notified the Surety of its declaration of default that same day. SUF ¶¶ 93-94. It is further undisputed that the Surety did not "complete the principal's work itself," *Granite Computer Leasing Corp.*, 894 F.2d at 551, and thus far has made no indemnity payment to the obligees. Pl. 56.1 St. ¶ 35; Fredette Decl. (Dkt. 196-16) ¶ 2. This is enough, plaintiffs contend, to warrant the grant of partial summary judgment as to the Surety's liability for breach of the Performance Bond, even though the amount of its liability has yet to be determined. Pl. Mem. at 24; *see also* Pl. Reply Mem. at 31 (arguing that plaintiffs are entitled to summary judgment now, because the Surety will be "liable under the performance bond to the extent that Plaintiffs establish damages recoverable under that bond").

Defendants disagree, pointing out that plaintiffs' narrative is incomplete. It is also undisputed, they note, that on September 13, 2018, ZDG notified defendants by email that it would retain PPA directly as a completion contractor, and on September 21, 2018, it did so – for *less* than the unpaid balance on the Subcontract. Def. 56.1 St. ¶¶ 158-61.[6] Consequently, defendants argue, the Surety's failure to complete the Subcontract did not result in any damage. Def. Mem. at 37. And while they acknowledge the Surety's obligation to indemnify plaintiffs "against any damages that they may have incurred by reason of Western's breach of the Subcontract" (up to the penal sum of $3.41 million), the Surety cannot be in *breach* of its obligation to do so, they contend, because the amount it will owe "is unsettled, and therefore, the Surety has not yet had an opportunity to remedy any default." *Id*. at 38.

---

[6] While generally admitting these facts, plaintiffs assert that PPA "did not have the full scope of work as in the Subcontract with Western." Pl. Resp. 56.1 St. at 44. Be that as it may, ZDG referred to PPA as "the completion contractor" when it advised the Surety that it would retain PPA directly. Def. 56.1 St. Ex. 102 (Dkt. 204-2).

Defendants are mistaken. The fact that the amount of the Surety's liability under the Performance Bond is still unresolved does not mean that it has no such liability. A surety bond "is a contract," *Arch Ins. Co. v. Precision Stone, Inc.*, 584 F.3d 33, 39 n.4 (2d Cir. 2009) (quoting *U.S. Fid. & Guar. Co.*, 369 F.3d at 51). Courts therefore "look to standard principles of contract interpretation to determine the rights and obligations of a surety under a bond." *Id.* Under New York law, a claim for breach of such a bond – like a claim for breach of any other contract – requires proof of "(1) the existence of a contract, (2) performance of the contract by one party, (3) breach by the other party, and (4) damages suffered as a result of the breach." *Triaxx Prime CDO 2006-1 Ltd. v. U.S. Bank Nat'l Ass'n*, 2024 WL 1381354, at *12 (S.D.N.Y. Mar. 31, 2024) (quoting *Beautiful Jewellers Priv. Ltd. v. Tiffany & Co.*, 438 F. App'x 20, 21-22 (2d Cir. 2011)); *accord Dani's Windows & Glass, Inc. v. Fid. & Deposit Co. of Maryland*, 2016 WL 11263171, at *3 (E.D.N.Y. Sept. 7, 2016), *adopted*, 2017 WL 1102676 (E.D.N.Y. Mar. 23, 2017). While proof of damages is "an essential element" of the claim, *iGo Mktg. & Ent., LLC v. Hartbeat Prods., LLC*, 217 A.D.3d 753, 754, 191 N.Y.S.3d 646, 648 (2d Dep't 2023), there is no requirement that any specific amount of damages be proven in order to obtain partial summary judgment as to liability. *See Townsquare Media, Inc. v. Regency Furniture, Inc.*, 2022 WL 4538954, at *17 (S.D.N.Y. Sept. 28, 2022) (granting partial summary judgment as to liability for breach of certain contracts but denying motion as to damages where existence of damages was proven but the quantum of damages was unclear). Consequently, the fact that the amount of the Surety's indemnification obligation remains "unsettled" does not prevent a determination as to liability.

I reach the same result through application of the basic principle – conceded by defendants – that "a surety's liability is coextensive with its principal." Def. Mem. at 38 (citing *Innovative Design & Bldg. Servs., LLC v. Arch Ins. Co.*, 2014 WL 4770098, at *19 (S.D.N.Y. Sept. 23, 2014)).

Here, the principal (Western) has expressly conceded its liability for breach of the Subcontract, even though the amount of that liability remains unliquidated. Def. Mem. at 38. Defendants offer no justification for treating the Surety any differently. Consequently, plaintiffs are entitled to partial summary as to liability on their claim against the Surety.

### C.    Negligence and Gross Negligence

New York law generally disallows claims in tort for the negligent performance of a duty arising under a contract. *See, e.g.*, *Clark-Fitzpatrick, Inc. v. Long Island R. Co.*, 70 N.Y.2d 382, 388-90, 516 N.E.2d 190, 194 (1987) ("Merely charging a breach of a 'duty of due care', employing language familiar to tort law, does not, without more, transform a simple breach of contract into a tort claim."). However, there is a narrow exception to this rule, recognized in *Sommer v. Fed. Signal Corp.*, 79 N.Y.2d 540, 593 N.E.2d 1365 (1992), and clarified, most recently, in *Dormitory Auth. v. Samson Constr. Co.*, 30 N.Y.3d 704, 713, 94 N.E.3d 456, 462 (2018), which held – as relevant here – that no separate negligence claim may be pursued, even against a professional whose allegedly negligent conduct caused "'abrupt' or 'catastrophic consequences," where "there was no injury alleged . . . that a separate negligence claim would include that is not already encompassed in [the plaintiff's] contract claim." 30 N.Y.3d at 713, 94 N.E.3d at 462. In the matter now before the Court, plaintiffs rely principally on *Sommer*, *see* Pl. Mem. at 17-18, 22, while defendants rely principally on *Samson*. *See* Def. Mem. at 9-13, 15.

In *Sommer*, a building owner (810) filed claims for breach of contract and negligence against the fire alarm company it retained to monitor the building's fire alarm system (Holmes), seeking $7 million in damages sustained after Holmes took the system out of service (apparently misunderstanding a request to *reactivate* service), and an otherwise containable fire went undetected until out of control. 79 N.Y.2d at 548-50, 593 N.E.2d at 1367-68. Holmes argued that

it could not be sued on a negligence theory because its duties to the plaintiff arose solely from the parties' contract, which expressly excluded negligence liability. *Id*. After recognizing that the case fell "in the borderland between tort and contract," 79 N.Y.2d at 550, 593 N.E.2d at 1368, the *Sommer* court held that the plaintiff could proceed on its negligence claim, reasoning that (1) fire alarm monitoring is a regulated service that provided a significant public benefit, such that Holmes had a "duty to act with reasonable care" that was "independent of [its] contractual duties"; (2) the "abrupt, cataclysmic occurrence" alleged by 810 was typical of a tort claim, both in respect to the manner in which it occurred and the harm that resulted; and (3) plaintiff sought damages unavailable under its contract (which not only expressly excluded damages caused "by negligent acts or omissions," but capped its contract damages, in case of breach, at $250). 79 N.Y.2d at 552-54, 593 N.E.2d at 1370-71. However, the *Sommer* court reiterated that, "where plaintiff is essentially seeking enforcement of the bargain, the action should proceed under a contract theory." 79 N.Y.2d at 552, 593 N.E.2d at 1369 (citing *Clark-Fitzpatrick* and *Bellevue S. Assocs. v. HRH Constr. Corp.*, 78 N.Y.2d 282, 579 N.E.2d 195 (1991)).

In *Samson*, the plaintiff (DASNY) sued the architect (Perkins) responsible for constructing a forensic biology laboratory next to Bellevue Hospital, alleging both breach of contract and negligence, after the building "settle[d]" by as much as eight inches, damaging adjacent structures (including City sidewalks and sewers), requiring emergency repairs, and leading to extensive delays. 30 N.Y.3d at 708, 94 N.E.3d at 458. Unlike in *Sommer*, the underlying contract did not limit plaintiff's ability to pursue consequential damages (such as the "costs to repair the damages to adjacent structures," 30 N.Y.3d at 712, 94 N.E.3d at 461), and DASNY never made any "distinction" between its damages recoverable in contract and those recoverable in tort. *Id*. Consequently, while the *Samson* court recognized that "there are circumstances" in which a

professional architect may be sued in tort, it held that DASNY's negligence claim should have been dismissed as duplicative of the breach of contract claim:

> [E]ven if any "abrupt" or "catastrophic" consequences either could have or did result from Perkins' alleged negligence, the fact remains that the only damages alleged appear to have been within the contemplation of the parties under the contract – and, indeed, as set forth above, are identical for both claims. Put another way, there was no injury alleged here that a separate negligence claim would include that is not already encompassed in DASNY's contract claim. In these circumstances, DASNY "is essentially seeking enforcement of the bargain, [and] the action should proceed under a contract theory" (*Sommer*, 79 NY2d at 552). Thus, we hold that the negligence claim is duplicative of the breach of contract cause of action and Perkins' motion for summary judgment to dismiss that cause of action should have been granted.

*Samson*, 30 N.Y.3d at 713, 94 N.E.3d at 461-62; *see also, e.g.*, *Volt Elec. NYC Corp. v. A.M.E., Inc.*, 586 F. Supp. 3d 262, 298 (S.D.N.Y. 2022) (dismissing subcontractor's negligence claim against sub-subcontractor where "[t]he alleged conduct underlying AME's contract and tort claims is identical, or virtually so," the alleged injuries "are also identical," and "as in *Dormitory Authority*, the Subcontract itself contemplates – and addresses in contract terms – Volt's responsibility" for the "additional costs or expenses" sought as damages by AME).

Here, plaintiffs argue that Western, like the fire alarm company in *Sommer*, had a duty of care independent of the Subcontract (including duties imposed by public safety regulations), and that its breach of those duties led to a similarly "abrupt, cataclysmic event" on June 25, 2018, which caused "physical property damage" as well as economic harm. Pl. Mem. at 17-19, 22. Defendants counter that plaintiffs' contract and tort claims arise out of the same underlying conduct, Def. Mem. at 20, and that "all of plaintiffs' alleged damages are directly addressed by the Subcontract." *Id*. at 10-11. Additionally, defendants argue that Western owed plaintiffs no independent duty of care. *Id.* at 14. Defendants are correct as to the first two points: plaintiffs'

contract and negligence claims arise out of the same conduct, allege the same injuries, and seek the same damages. Consequently, the Court's analysis begins and ends there.

From the outset of this action, plaintiffs have premised their contract and negligence claims against Western on precisely the same conduct. Thus, in the Amended Complaint, after describing Western's alleged misconduct, plaintiffs allege in ¶ 49 that "[t]he actions and omissions of Western . . . set forth above were a material breach of the Subcontract," and in ¶ 57 that "[t]he actions and omissions of Western . . . set forth above were a breach of the above duties owed to ZDG and [BDG]." Am. Compl. ¶¶ 49, 57. No additional "actions and omissions" are alleged between ¶ 49 and ¶ 57. Similarly, the Amended Complaint seeks the same quantum of damages ($37.1 million) on all of plaintiffs' claims against Western. *Id*. ¶¶ 50, 59, 68.[7] Since then, although their damages estimate has waxed and waned somewhat, plaintiffs have never differentiated between their contract damages and their tort damages. *See* SUF ¶ 105 ("In their FRCP 26(a)(1) Initial Disclosures, Plaintiffs 'preliminarily estimated' their damages 'to be not less than $15,191,970.91[.]'"); Pl. Damage Chart at 1-2 (presenting a unitary damages estimate of $20,371,359.61, with no distinction between contract and tort recovery); *see also* Def. 56.1 St. ¶ 89 (noting that Wallwork, testifying as plaintiffs' Rule 30(b)(6) representative on damages, confirmed that all of the damages in his report were "recoverable under the Subcontract"). Plaintiffs have thus consistently acknowledged that their potential damages for breach of contract and for negligence "are identical." *Samson*, 30 N.Y.3d at 713, 94 N.E.3d at 462.

Moreover, it is difficult to imagine what compensatory damages plaintiffs *could* seek under a negligence theory that would not be available to them under the Subcontract itself. Unlike in

---

[7] Paragraph 68, concerning the gross negligence claim, also requests punitive damages. That issue is addressed below.

*Sommer*, where the contract's exculpatory and limited-liability provisions significantly capped plaintiff's potential recovery in contract, *see* 79 N.Y.2d at 549, 593 N.E.2d at 1368, the Subcontract at issue here expressly contemplates Western's liability to ZDG for "[a]ny cost or expense due to [Western's] negligent or intentional misconduct," Subcontract at § 2.8, and "for any and all damages, losses, costs and expenses, which by reason of any default of the Subcontractor with respect to the due performance of its obligations hereunder *or any negligence or unlawful conduct of the Subcontractor*." *Id.* § 19.1(f) (emphasis added). Because the contract expressly incorporates damages for negligence, a separate negligence claim would be – by definition – duplicative of plaintiffs' breach of contract claim. *See Samson*, 30 N.Y.3d at 712, 94 N.E.3d at 461("Significantly, in the contract itself, the parties contemplated [defendant's] responsibility for additional costs or expenses incurred . . . as a result of . . . design errors or omissions, and addressed it in the contract terms.").

Plaintiffs spill much ink arguing that they have established the elements of negligence (duty, breach, causation, and damages). *See* Pl. Mem. at 16-23. Additionally, in their reply brief, they argue vigorously that Western's independent duties of care – for example, to comply with applicable safety laws – would exist "whether or not they are also redundantly imposed by the parties' contract." Pl. Reply Mem. at 3. This argument misses the point. The question, under New York law, is not whether the defendant might be exposed to negligence liability in the absence of a contract; it is whether – given that there is a contract, and a contract claim – the negligence claim has become duplicative. Under *Samson* and its progeny, this Court must answer that question in the affirmative where, as here, "the fact remains that the only damages alleged appear to have been within the contemplation of the parties under the contract – and, indeed, as set forth above, are identical for both claims." *Samson*, 30 N.Y.3d at 713, 94 N.E.3d at 462.

Plaintiffs' remaining arguments are similarly unavailing. They first contend that it is the "law of the case" that their allegations, if proven, are sufficient to sustain a cause of action for negligence (citing *BDG Gotham I*, 2020 WL 6825679, at *2-4), and reason that since all of the elements of their negligence claim are now undisputed, they are entitled to summary judgment in their favor (or, at least, to proceed to trial) on their negligence claim. Pl. Mem. at 16; Pl. Reply Mem. at 10. In *BDG Gotham I*, however, Judge Nathan focused on two of the *Sommer* factors – whether Western engaged in "dangerous, irresponsible behavior that would be independently actionable as negligence even absent a contractual obligation to timely complete construction," and whether its "alleged negligence resulted in sudden and precipitous injuries to both workers and the surrounding property," 2020 WL 6825679, at *3 (cleaned up) – without discussing the factor identified as dispositive by the *Samson* court: whether the damages "are identical for both claims," such that all of plaintiffs' alleged injuries are compensable through their contract claim. *Samson*, 30 N.Y.3d at 713, 94 N.E.3d at 462; *see also Volt Elec.*, 586 F. Supp. 3d at 298 (no separate negligence claim permitted where "the Subcontract itself contemplates – and addresses in contract terms – [defendant's] responsibility" for the "additional costs or expenses" sought as damages by plaintiff).

Moreover, *BDG Gotham I* was decided on the pleadings, well before plaintiffs developed their damages evidence. It is well settled that "[t]he law of the case doctrine . . . does not preclude this Court from reconsidering issues on summary judgment," even the same issues were "initially been raised in the context of a motion to dismiss." *Nobel Ins. Co. v. City of New York*, 2006 WL 2848121 at *4 (S.D.N.Y. Sept. 29, 2006) ("[A]s a ruling in favor of a plaintiff on a motion to dismiss does not address the merits of a case, such ruling will not preclude a subsequent ruling in favor of a defendant on the same issue on a motion for summary judgment following discovery.").

Thus, *BDG Gotham I* does not preclude this Court from determining, at summary judgment, that plaintiffs' negligence claim is duplicative of their contract claim.

Next, plaintiffs argue that their tort claims should survive because they "suffered adverse regulatory consequences" which extend "beyond pure economic losses or failure to realize the benefit of their bargain." Pl. Mem. at 23. They explain that the DOB violations against ZDG (which are undisputed, *see* SUF ¶¶ 99-100) "result in not only monetary fines, but also remain a part of ZDG's and the Project's regulatory record and have reputational and other consequences." Pl. Mem. at 23. However, plaintiffs never pleaded any reputational injury, did not identify any related damages in their Rule 26(a)(1) disclosures, did not discuss any reputational harm or describe any reputational damages in the Wallwork Report (which means that plaintiffs "are not seeking" such damages, *see* SUF ¶ 114), and do not present any evidence as to the existence or amount of such damages. Consequently, their eleventh-hour discovery of a new category of loss (addressed only in their brief) cannot save their tort claims.

Plaintiffs further contend that Western is "making contradictory arguments," noting that when it filed its answer, in 2019, it asserted as an affirmative defense that "Plaintiffs' claims include claims for damages, including consequential damages, that are not recoverable under the terms of the CM Agreement between [BDG and ZDG] and therefore cannot be claimed against [Western]." Pl. Reply Mem. at 9-10 (first alteration in original) (citing Western Ans. (Dkt. 60) at 10, ¶ 80). This argument does not assist plaintiffs, because it is their burden to affirmatively demonstrate that they seek damages for negligence that are unavailable under the Subcontract. Moreover, as discussed in Part III(D), *infra*, plaintiffs are in fact seeking consequential damages under the Subcontract. Thus, there is some force to defendants' argument that it is plaintiffs who "are improperly trying to have it both ways when they claim that they are entitled to consequential

damages 'under both their contract and tort theories,'" but that their negligence claim should not be deemed duplicative because Western once argued otherwise. Def. Reply Mem. at 7 (quoting Pl. Reply Mem. at 10).

Finally, plaintiffs argue that their "gross negligence based punitive damages claims conclusively demonstrate that they seek different damages in contract and in tort." Pl. Reply Mem. at 8-9. This argument also fails. Where, as here, a lawsuit "has its genesis in the contractual relationship between the parties," a plaintiff must meet a high bar in order to establish a claim for punitive damages. *New York Univ. v. Cont'l Ins. Co*., 87 N.Y.2d 308, 316, 662 N.E.2d 763, 767 (1995) (citing *Rocanova v. Equitable Life Assurance Soc'y*, 83 N.Y.2d 603, 613, 634 N.E.2d 940, 944 (1994)). In *Rocanova*, the New York Court of Appeals set forth the four elements that a plaintiff must satisfy before it may be awarded punitive damages on a tort claim arising from a contractual relationship: (i) the defendant's conduct was actionable as an independent tort; (ii) the tortious conduct was egregious; (iii) the egregious conduct was directed at the plaintiff; and (iv) "the conduct was part of a pattern of similar conduct directed at the public generally." 83 N.Y.2d at 613, 634 N.E.2d at 944 (1994)). This "extraordinary remedy" is available "only in a limited number of instances." *Id*. (citation omitted).

Plaintiffs do not dispute that *Rocanova* controls. Pl. Reply Mem.at 15. Rather, they argue that "Western's violations meet this standard[.]" *Id*. The Court disagrees.

This question turns on the fourth prong of the *Rocanova* test. A single incident, even an "egregious" incident perpetrated against the public, is insufficient to "evince[] a pattern of conduct harming the general public." *United States v. Merritt Meridian Constr. Corp.*, 95 F.3d 153, 161 (2d Cir. 1996). Thus, even if the Court were to assume that Western's conduct satisfies the first three *Rocanova* prongs, plaintiffs' quest for punitive damages would fail, because they did not

24

plead, have never argued, and proffer no evidence suggesting that the June 25, 2018 accident was part of a "pattern of conduct" by Western, much less a pattern directed at "the general public." *See Leviton Mfg. Co. v. Reeve*, 942 F. Supp. 2d 244, 270-71 (E.D.N.Y. 2013), *amended* (Mar. 23, 2013) (dismissing claim for punitive damages where, even if the court were to "assume . . . that the tortious conduct is of an egregious nature . . . . Plaintiff has alleged only a single incident of misrepresentation to a single victim, so that the Plaintiff cannot recover punitive damages"); *Huang v. iTV Media, Inc.*, 79 F. Supp. 3d 458, 465 (E.D.N.Y. 2015) (dismissing punitive damages claim on the pleadings where the allegations in the complaint "describe[] fraud with respect to a single contract, not a 'pattern' or broader scheme of behavior"); *Mayline Enterprises, Inc. v. Milea Truck Sales Corp.*, 641 F. Supp. 2d 304, 312 (S.D.N.Y. 2009) ("[P]laintiff cannot recover punitive damages for that single incident of fraud.").

Because plaintiffs cannot satisfy the heightened *Rocanova* standard, they are not entitled, as a matter of law, to ask the jury for punitive damages. And because they have no path to punitive damages, both of their tort claims must be dismissed as duplicative of the claim for breach of contract. Accordingly, defendants are entitled to summary judgment on plaintiffs' claims for negligence and gross negligence.

### D.    Damages

The original Wallwork Report identified 62 items of delay damages attributable to Western. *See* Pl. Damage Chart at 1-2. Two items were withdrawn in the Wallwork Rebuttal, and several additional items were revised downward, leaving a total of 60 items, totaling $20,169,845.25. *See* Wallwork Rebuttal at 20-43; Annotated Damage Chart, Def. 56.1 St. Ex. 114 (Dkt. 204-14). Defendants now seek summary judgment as to eighteen different items across six broad categories of claimed damages, labeled: Lost Revenue, Lost Marketing, Additional Loan

Expenses, Home Office Overhead, Insurance Deductibles, and Attorneys and Consultant Fees. *See* Def. Mem. at 22-36; Annotated Damages Chart at 2. In total, the challenged items amount to $15,422,106.76. Annotated Damages Chart at 2.

In New York, a party in breach of a contact is liable for "all direct and proximate damages which result from the breach," provided that they are "reasonably certain" rather than "merely speculative, possible, and imaginary." *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 110 (2d Cir. 2007) (emphasis omitted) (quoting *Wakeman v. Wheeler & Wilson Mfg. Co.*, 101 N.Y. 205, 209, 4 N.E. 264, 266 (1886)). The governing standards differ depending on whether the damages sought are "general" or "consequential." *NAF Holdings, LLC v. Li & Fung (Trading) Ltd.*, 2016 WL 3098842, at *15 (S.D.N.Y. June 1, 2016). "A plaintiff is seeking general damages when he tries to recover the value of the very performance promised. Consequential damages seek to compensate a plaintiff for additional losses (other than the value of the promised performance) that are incurred as a result of the defendant's breach." *PNC Bank, Nat. Ass'n v. Wolters Kluwer Fin. Servs., Inc.*, 73 F. Supp. 3d 358, 370-71 (S.D.N.Y. 2014) (citations and internal quotation marks omitted). To obtain general damages, the plaintiff "need only show a stable foundation for a reasonable estimate of the damage." *Tractebel Energy*, 487 F.3d at 110 (internal quotation marks omitted) (quoting *Contemporary Mission, Inc. v. Famous Music Corp.*, 557 F.2d 918, 926 (2d Cir. 1977)). To obtain consequential damages, however, the plaintiff must show (1) that the damages sought were "foreseeable and within the contemplation of both parties," and (2) that both the "existence" and "amount" of damages can be ascertained with "reasonable certainty." *Id.*, 487 F.3d at 111 (quoting *Kenford Co. Inc. v. Erie County*, 67 N.Y.2d 257, 261, 493 N.E.2d 234, 235 (1986)). Because all of the damages at issue here are consequential, the heightened standard applies.

26

As to most of the items now at issue, defendants contend that plaintiffs cannot establish the existence or the amount of recoverable damages to a "reasonable certainty." As to the Insurance Deductibles and Litigation Fees, however, defendants contend that the damages sought are not recoverable as a matter of law. I discuss each category in turn.

### 1.    "Lost Revenue"

Defendants seek summary judgment as to plaintiffs' claim for approximately $5.1 million in what Wallwork calls "lost revenue," *see* Wallwork Rep. at 67; Wallwork Rebuttal at 36, but which is in fact an estimate of the lost *profits* resulting from BDG's inability to rent out the apartments and commercial space in the Project while the building remained unfinished. *See* Pl. Reply Mem. at 18 (recognizing claim as one for "lost profits on the delayed rentals of the apartment units in the project as a result of the construction delays caused by Western's actions"); Blumenfeld Dep. Tr. I (Dkts. 210-2, 211-1) at 96:4-10 (agreeing that the claim is for lost profit).

Lost profits are properly considered consequential damages where, as here, the plaintiff contends that "as a result of the breach, the non-breaching party suffers loss of profits on collateral business relationships." *Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co.*, 650 F. Supp. 2d 314, 322 (S.D.N.Y. 2009) (cleaned up) (quoting *Tractebel Energy*, 487 F.3d at 109), *aff'd*, 976 F.3d 239 (2d Cir. 2020). Accordingly, under New York law, a party may only recover damages for lost profits if it "can establish both the existence and amount of such damages with reasonable certainty." *Schonfeld v. Hilliard*, 218 F.3d 164, 172 (2d Cir. 2000).

Wallwork "explained" this item of damages in a single paragraph of his original report, stating: "The Curtain Wall delays prevented the project from being finished by the scheduled date, leading to an inability to rent the units. The losses for residential and commercial units [were] incurred by not having the units finished for rental are calculated based on market value."

Wallwork Rep. at 67. Wallwork then lists the total losses as $18,468,064.74, and opines that $5,097,185.87 (27.6%) is attributable to Western. *Id*. at 68. He repeats the same "explanation," word for word, in his rebuttal report. Wallwork Rebuttal at 36. But he provides no further detail, and no backup data whatsoever, to support any aspect of the lost profits estimate.[8]

This gap was explained at deposition by BDG's principal David Blumenfeld, who testified that Wallwork had no role in "putting this lost profit calculation together." Blumenfeld Dep. Tr. I at 97:3-6. According to Blumenfeld, the underlying calculations were done by Citrin Cooperman, an accounting firm, *id.* at 96:19-24; 97:7-11, which provided the total lost profit number (of "18 million and change") to Wallwork. Blumenfeld Dep. Tr. II (Dkt. 214-1) at 153:23-154:7; *see also* Blumenfeld Dep. Exhibit 191 (Wojak Decl. Ex. 121) (Dkt. 210-1) (one page of typed notes, marked as an exhibit at Blumenfeld's deposition, explaining that the "total lost profit" of $18,468,065 was "calculated by Citrin").[9] Blumenfeld himself was involved only "[a] little bit" with Citrin in putting together that number. Blumenfeld Dep. Tr. I at 97:12-16.

---

[8] For example, Wallwork provides no information regarding the number or square footage of the residential and commercial units in the building; the expected monthly rents for the various types and configurations of the residential units in the building (including both "market rate" units and income-capped "affordable housing" units); anticipated residential occupancy rates during the initial lease-up period; the expected rental revenue for the (pre-leased) commercial units; or any of the variable costs (such as building staff, maintenance, cleaning, security, and repairs) necessarily incurred in order to generate rental revenue.

[9] At deposition, Blumenfeld described Exhibit 191 as a "cheat sheet" to help explain some of BDG's damages calculations. Blumenfeld Dep. I at 86:6-8. It was prepared by Blumenfeld's "office" and produced at his deposition. Pl. Reply Mem. at 20. As relevant here, Exhibit 191 explained that Citrin's calculation was based, in turn, on various "assumptions" that were never disclosed or discussed by Wallwork, including the use of "industry averages for monthly rents," plus a 10% premium for "quality," based on figures provided by Brown Harris Stephens; the use of "HPD published rents" for the income-capped units; an annual "vacancy allowance," provided by Cushman & Wakefield; the use of the "average commercial rent psq [per square foot] in Harlem" to estimate commercial income; and the deduction of unspecified "variable operating expenses" from the anticipated rental revenues. Blumenfeld Dep. Ex. 191 at 1.

The Citrin report was never produced in discovery, *see* Def. Reply Mem. at 11, and consequently cannot be relied on by plaintiffs either to resist summary judgment or at trial. The only lost profits calculation ever produced was contained in the (now-precluded) Fitzhugh Report, which relied, in turn, on the (now-precluded) Kliegerman Report regarding market rents. Thus, there is no expert opinion, calculation, document, data, or other evidence in the record that could support an estimate, to a "reasonable certainty," *Tractebel Energy*, 487 F.3d at 111, of the rental profits that BDG would have earned but for the delay caused by the June 25, 2018 accident.

Plaintiffs concede that they "have no admissible documentary evidence" to support their lost profits claim. Pl. Resp. 56.1 St. ¶ 95. Nonetheless, they argue, summary judgment should not be granted to defendants on this item because plaintiffs "intend to present testimonial evidence at trial regarding these damages," *id*., from Blumenfeld, who is "an experienced real estate developer" and will "testify regarding his experience, the studies and planning that were done to eliminate any speculative element regarding the building's rental success, and the current successful nature of the venture." Pl. Reply Mem. at 19. "No expert testimony is necessary," plaintiffs contend, "because these are not projections of lost future possibilities; the building has been and is successful and there is nothing speculative about calculating the lost income from the period of delay." *Id*.

Plaintiffs' position is wholly untenable. First, to defeat summary judgment, a non-moving party must "come forward with admissible evidence" sufficient to show that it could carry its burden at trial. *Simsbury-Avon Pres. Soc'y, LLC v. Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d Cir. 2009) (citing *Celotex*, 477 U.S. at 322-23); *see also* Fed. R. Civ. P. 56(c)(1) (a party seeking or opposing summary judgment must support its assertions by "citing to particular parts of materials in the record"). Plaintiffs have not done so. They did not submit any declaration from

Blumenfeld, and his deposition testimony does not even begin to support their lost profits claim. Moreover, as they admit, they have no "admissible documentary evidence," Pl. Resp. 56.1 St. ¶ 95, supporting their lost profits claim. Rather than "come forward" with evidence from which a jury could return a verdict in their favor, *see Anderson*, 477 U.S. at 248, plaintiffs merely *argue*, in their brief, that they *will* have such evidence available, in the form of oral testimony, by the time of trial.

This is insufficient. When a summary judgment motion is made, "[t]he time has come . . . 'to put up or shut up.'" *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000) (citation omitted). "Indeed, the very purpose of summary judgment – preserving resources for the adjudication of actual disputes – would be defeated if the non-movant, failing to meet its burden at the summary judgment stage, were given yet another opportunity to uncover and present facts at trial." *U.S. Bancorp Oliver-Allen Tech. Leasing v. Hall, Dickler, Kent, Goldstein & Wood, LLP*, 2005 WL 1875459, at *4 (S.D.N.Y. Aug. 8, 2005) (Lynch, J.). It is thus well-settled that where, as here, a defendant seeks summary judgment on the ground that the plaintiff "has not presented any evidence of its damages," the plaintiff must *present* (not merely assert that it is capable of presenting) evidence showing "the *amount* of such damages (or at least a fair estimation of same)[.]" *New Paradigm Software Corp. v. New Era of Networks, Inc.*, 2002 WL 31749396, at *15-17 (S.D.N.Y. Dec. 9, 2002) (granting summary judgment for defendant where plaintiff sought a "legally correct measure of damages," based on sales that would have been made had defendant honored the parties' contract, but "offered no evidence as to what those sales should have been"); *see also W.S.A., Inc. v. ACA Corp.*, 1998 WL 635536, at *6 & n.3 (S.D.N.Y. Sept. 15, 1998) (granting partial summary judgment to W.S.A. on damages, because "ACA's efforts to produce additional evidence of damages are limited to statements by [its treasurer] that there were

additional costs which will be proven at trial," whereas under Rule 56, ACA was required to "come forward with sufficient evidence of damages to defeat the present summary judgment motion"); *Lovely Peoples Fashion, Inc. v. Magna Fabrics, Inc.*, 1998 WL 422482, at *5-6, *12 (S.D.N.Y. July 22, 1998) (granting summary judgment for defendant on plaintiff's claim for lost profits where plaintiff submitted no "competent evidence upon which a jury could reasonably base an award for lost profits").

Second, even if a promise of future trial testimony could substitute for the "competent evidence" required to defeat summary judgment, *Lovely Peoples Fashion*, 1998 WL 422482, at *5, Blumenfeld could not provide the necessary evidence. He was never disclosed as an expert pursuant to Fed. R. Civ. P. 26(a)(2)(C), and therefore would be limited at trial to lay testimony, which must be "rationally based on the perception of the witness." Fed. R. Evid. 701(a); *see also United States v. Glenn*, 312 F.3d 58, 67 (2d Cir. 2002) ("This requirement is the familiar requirement of first-hand knowledge or observation.") (internal quotation marks and citation omitted). Thus, Blumenfeld would be precluded from relying on the Citrin report, the Fitzhugh Report, the Kliegerman Report, or any other third-party analysis. Similarly, he would be unable to reference, discuss, or rely upon the multiple data sources that experts (including Citrin and Fitzhugh) customarily use to undergird their analyses.[10]

At best, Blumenfeld could testify about BDG's *actual* rental revenues, expenses, and profits during later periods, after the building was completed (assuming, *arguendo*, that the documents on

---

[10] Blumenfeld's deposition testimony demonstrates the need for such data sources. For example, when asked whether BDG took into account the effects of the COVID pandemic on the New York rental real estate market during the delay period, Blumenfeld provided hearsay testimony that Citrin "went to Brown Harris Stevens, . . . a large broker in Manhattan, got their report for Harlem average rents for the periods of times covered, went and got Harlem average operating expenses for the time period covered, added a premium . . . took the average vacancy rates out of it, and then came to your profitability." Blumenfeld Dep. Tr. II at 159:10-160:6.

which he would necessarily rely for the economic details were produced in discovery). However, it is by no means obvious that these figures would illuminate BDG's *hypothetical* rental revenues, expenses, and resulting profits, had the building opened 185 days earlier (the period of delay that Wallwork attributes to Western) – which would have placed its grand opening in June 2020, during the first wave of the COVID pandemic in New York. *See* Blumenfeld Dep. Tr. I at 100:4-7 (agreeing that if the building had opened 185 days earlier, it would have opened "sometime in June 2020"); *id*. at 54:14-15 ("It was an odd year because of the pandemic.").[11]

It was plaintiffs' obligation to "come forward with sufficient evidence of damages to defeat the present summary judgment motion." *W.S.A.*, 1998 WL 635536, at *6. Having failed to do so, they are not entitled to "yet another opportunity" at trial. *U.S. Bancorp Oliver-Allen Tech. Leasing*, 2005 WL 1875459, at *4. Moreover, even if they were given that opportunity, neither Blumenfeld nor any other lay witness could establish both the existence and amount of BDG's lost rental profits caused by Western's breach with "reasonable certainty," as required. *Tractebel Energy*, 487 F.3d at 111; *Schonfeld*, 218 F.3d at 172. Consequently, summary judgment will be granted to defendants on the claim for BDG's "lost revenue."

---

[11] Plaintiffs cite *Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256 (2d Cir. 1995), for the proposition that a business owner can testify competently about lost profits in his own business. Pl. Reply Mem. at 25. In that case, however, the question was whether the plaintiff (a lock equipment manufacturer) *lost* existing customers and sales – and the attendant profits – as a result of defamation by a rival lock equipment manufacturer. *Securitron*, 65 F.3d at 265. The court held that "[a] company president certainly is capable of projecting lost profits where the projection is based on evidence of decreased sales." *Id*. In the case at bar, by way of contrast, Blumenfeld proposes to testify about profits that would have been earned by leasing residential and commercial units in a newly-constructed building – never previously occupied – had it opened six months earlier, in an "odd year."

### 2.    Lost Marketing

Defendants also seek summary judgment as to an item of consequential damages that Wallwork refers to as "Lost Marketing Expense." Wallwork Rep. at 67. Wallwork explains that BDG's "building was to be featured on a cable Tv show called 'Million Dollar Listing,'" which "would have provided significant free advertising and sales boost." *Id*. However, because "the building was not complete and was excluded from the TV show," BDG was "injured in an amount equal to the cost of nationally shown TV commercials of length equivalent to the time that the building would have been shown during the 'Million Dollar Listing' show." *Id*. Additionally, Wallwork states, BDG was injured in the amount of its out-of-pocket payments for "marketing material . . . developed in preparation for the building[']s opening," which became obsolete and had to be abandoned. *Id*. Wallwork opines that the total "[c]ost of this item" is $1,610,234.00, of which he allocates $444,424.58 (27.6%) to Western. *Id*.

 He repeats the same "explanation," word for word, in his rebuttal report. Wallwork Rebuttal at 36. But he provides no further detail, and no backup data whatsoever, to support any aspect of the "lost marketing expense," and concedes, in his rebuttal report, that the $1,610,234 figure was "calculated and presented" to him by BDG. *Id.* As evidence of that calculation, Wallwork attached, to his rebuttal report, an unsigned, undated note containing a single paragraph valuing the lost Million Dollar Listing (MDL) opportunity at $1,312,500, and a collection of invoices, summing to $297,734, which appear to reflect actual marketing expenditures by BDG between 2015 and 2017. *See* Preclusion Order at 8-9 & n.6. Plaintiffs cannot introduce any of this "backup" into evidence, or rely on it at trial, because they failed to produce it during the discovery period. *See id.* at 17.

Plaintiffs concede that there was never any contract for the Project to appear on MDL. *See* Pl. Resp. 56.1 St. ¶¶ 97-98; Blumenfeld Dep. Tr. I at 90:11-14. Moreover, Blumenfeld acknowledged at deposition that the Project was delayed for almost one year before the June 25, 2018 accident, and he could not recall when MDL "pulled the plug" on the plan to feature the Project on the show. Blumenfeld Dep. Tr. I at 92:24-93:21. He was therefore uncertain as to whether, by the time of the accident, it was already "too late to film the show." *Id*. at 93:4-13. Plaintiffs do not point to any other evidence from which a reasonable jury could conclude that the loss of the MDL opportunity was proximately caused by Western's June 25, 2018 accident. They have thus failed to meet their burden, at summary judgment, of identifying admissible evidence in the record from which reasonable jury could return a favorable verdict on this category of damages. *Anderson*, 477 U.S. at 248, 249; *Simsbury-Avon Pres. Soc'y*, 575 F.3d at 204.

Plaintiffs further concede that the only admissible documentary evidence in the record concerning the value of the lost marketing opportunity is the "cheat sheet" marked as Exhibit 191 at Blumenfeld's deposition, *see* Pl. Resp. 56.1 St. ¶¶ 99-100, which – they say – "sets forth in detail how the lost marketing claim was calculated." Pl. Reply Mem. at 20. Exhibit 191 explains that the $1,610,234 figure given to Wallwork was made up of $1,312,500 for "[l]oss of exposure" on MDL and $297,734 for the money BDG spent on "marketing plans" that became "stale by the time construction was actually nearing competition." Blumenfeld Dep. Ex. 191 at 1. The $297,734 matches the marketing invoices attached to Wallwork's rebuttal report, which plaintiffs are precluded from introducing or relying upon. The $1,312,500 is the product of a multi-step

calculation premised on a series of "assumptions" for which there is no suggestion, in the "cheat sheet," of any empirical support.[12]

Plaintiffs acknowledge that there is no documentary evidence in the summary judgment record backing up either the methodology or the data used in Exhibit 191. Pl. Resp. 56.1 St. ¶ 100. In their view, however, that is no barrier to the pursuit of their "lost marketing" damages because they "intend to present testimonial evidence at trial regarding these damages," *id.* ¶ 103, which will come from Blumenfeld, who "gave detailed deposition testimony regarding these items" and "will testify at trial in greater detail regarding them." Pl. Reply Mem. at 21.

Blumenfeld did indeed testify at deposition about the calculation of the $1,312,500 figure given to Wallwork. However, as plaintiffs admit, the gist of his testimony was that the assumptions used in that calculation were "based upon numerous conversations with several identified television industry professionals regarding the value of the broadcast spot, including the number of anticipated reruns." Pl. Reply Mem. at 20.[13] As a lay witness, Blumenfeld cannot offer an

---

[12] According to the cheat sheet, the benefit of a free appearance on MDL was equivalent to the value of a paid 30-second ad aired during MDL, and the price of such an ad was $100,000. Blumenfeld Dep. Ex. 191 at 1. Exhibit 191 then assumes that as many as three episodes of MDL would feature the Project (3x $100,000 = $300,000); that each such episode would later stream five times on Bravo (3 x 5 = 15); that the value of each of those fifteen streaming exposures would be $50,000 (15 x $50,000 = $750,000); and that the total value of the three original episodes plus the fifteen Bravo streams ($300,000 + $750,000 = $1,050,000) should be adjusted upwards by 25% to reflect a premium for "organic" exposure "vs paid advertising" ($1,050,000 x 1.25 = $1,312,500). *Id.* The *only* assumption in this chain for which any support is identified is the $100,000 price for a 30-second paid ad on MDL, which was "per Ryan Serhant's team." *Id.* Serhant was the star of MDL. *See* Bravo, *Million Dollar Listing New York*, https://www.bravotv.com/million-dollar-listing-new-york (last visited September 30, 2024).

[13] Specifically, Blumenfeld testified, he learned that a 30-second paid advertisement on MDL would cost $100,000 by calling a "friend of mine" who "ran Bravo at the time," *see* Blumenfeld Dep. Tr. I at 88:21-24; he asked "media buyers" to "help us sort of calculate the value of this," *id.* at 88:23-89:4; and he assumed that each episode would be streamed five more times because he spoke to personnel at Valani, the Project's media buyer, and to "my friend at Bravo, who is no longer there," and "[t]hey all felt this would be the right number." *Id.* at 90:3-8. Beyond that,

opinion based on what his friends in other industries told him. *Compare* Fed. R. Evid. 701(a)-(c) (lay opinion testimony must be "rationally based on the witness's perception" and "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702") *with* Fed. R. Evid. 703 (a qualified expert witness "may base an opinion on facts or data . . . that the expert has been made aware of," which need not be independently admissible so long as "experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject"); *see also* Fed. R. Evid. 701, advisory committee's note to 2000 amendments (explaining that the rule limiting a lay witness to opinions based on his "perception" was designed to prevent "the simple expedient of proffering an expert witness in lay witness clothing").

Moreover, Wallwork agreed at deposition that calculating the value of an appearance on MDL requires either "expertise" or "first-hand knowledge" of, among other things, advertising, *see* Pl. Resp. 56.1 St. ¶ 102; Wallwork Dep. Tr. III (Dkt. 204-15) at 240:2-9, and Blumenfeld testified that he had no relevant expertise. Pl. Resp. 56.1 St. ¶ 101; Blumenfeld Dep. Tr. I at 88:19-20, 89:12-16. Consequently, Blumenfeld cannot carry plaintiffs' burden, at trial, of establishing both the existence and the value of the marketing opportunity that BDG lost when construction delays prevented the Project from being featured on MDL, with "reasonable certainty." *Tractebel Energy*, 487 F.3d at 111; *Schonfeld,* 218 F.3d at 172.

Nor can he testify, without violating the Preclusion Order, that BDG spent $297,734 on marketing that "had to be abandoned because of the lost opportunity to show the building on Million Dollar Listing." Pl. Reply Mem. at 20. It is true that Exhibit 191 "sets forth the component amounts adding up to this total of $297,734 and the companies to whom they were paid," and that

---

Blumenfeld had "no specific methodology." *Id*. at 90:9-10. Blumenfeld did not further identify the friend at Bravo, the media buyers, or the Valani personnel to whom he spoke.

Blumenfeld testified about these sums at deposition. *Id.* at 20-21; *see also* Blumenfeld Dep. I at 88:4-15 (explaining that "we spent $297,000 that was just tossed, because it was all tied to – it was all marketing coordinated to being on Million Dollar Listing"). But Exhibit 191 simply summarizes the underlying invoices, and therefore cannot be used at trial. Similarly, neither Blumenfeld nor any other BDG witness is permitted to "rely" on those invoices, "or their contents," at trial. Preclusion Order at 19. Blumenfeld does not claim (and could not plausibly claim) that he has personal knowledge of the precise sums paid to four different marketing firms in the 2015-17 time period, apart from reviewing either the invoices themselves or a summary of their contents (such as Exhibit 191). And while it is theoretically possible that some witness or combination of witnesses at BDG might be able to present fact testimony on this issue without relying on the invoices, plaintiffs – who were required to "come forward with admissible evidence" sufficient to show that they could carry their burden at trial, *Simsbury-Avon Pres. Soc'y*, 575 F.3d at 204 – have not done so here. Consequently, summary judgment will be granted to defendants on plaintiffs' claim for "lost marketing" expenses.

### 3. Extended Loan Expenses

Plaintiffs contend that because of the construction delays caused by Western, BDG was required to extend (or obtain) multiple loans, and thus incurred additional interest and fees. In total, BDG asserts that it incurred $5,322,622.65 in additional interest and fees, which it claims as damages. *See* SUF ¶¶ 120-125. Specifically, BDG seeks $1,380,008.44 due to "extended interest and fees" incurred on what the parties call the "AIG Loan," *id.* ¶ 120; $841,493.07 in "extended interest and fees" on the "Acadia & EB-5 Loan," *id.* ¶ 123; $883,423.58 on "an additional AIG Bridge Loan," *id.* ¶ 124; and $2,217,697.56 for "extended interest and fees associated with" a group of loans referred to as the "Valley & Member Loans." *Id.* ¶ 125.

These figures initially appeared in the original Wallwork Report, with very little explanation,[14] and no backup documentation. They appeared again in the Wallwork Rebuttal, still unexplained, but now accompanied by voluminous attachments. *See* Wallwork Rebuttal at 35; Preclusion Order at 8. Many of those backup documents, however, were never previously produced in discovery, and hence cannot now be relied upon. *See* Preclusion Order at 8, 19.

At deposition – both before and after he submitted his rebuttal report – Wallwork was unable to answer basic questions about the underlying loans, and repeatedly acknowledged that the numbers in his report were "calculated by BDG accounting personnel," not by him. Wallwork Dep. Tr. I (Dkt. 195-48) at 161:23-24; *see also id*. at 162:23-24, 164:20-22, 165:17-21; Wallwork Dep. Tr. II (Dkt. 195-50) at 205:10-20, 210:6-11, 214:17-23, 217:4-10, 218:25-219:5. Blumenfeld, by contrast, was able to describe each relevant loan (at least in broad terms), and helpfully provided another "cheat sheet" listing the closing date, initial principal, interest rate, and maturity date for each loan at issue. *See* Blumenfeld Dep. Tr. I at 41:4-24; Blumenfeld Dep. Ex. 188 (Wojak Decl. Ex. 123) (Dkt. 210-3). However, the summary judgment record does not contain any deposition testimony or affidavit from Blumenfeld (or anyone else) explaining how BDG calculated the numbers that it provided to Wallwork.

Defendants now move for summary judgment as to each of the four loans. They acknowledge the borrowings, but argue that: (i) plaintiffs cannot establish that the loans were "extended" (or in the case of the AIG Bridge Loan, originated) because of Western's delays; and (ii) given the fragmented state of the record, plaintiffs cannot possibly show, with reasonable

---

[14] For each loan, Wallwork began with either a "daily rate," which he multiplied by 185 days of delay to arrive at the "claimed amount," or a total "cost" figure, which he multiplied by 27.6% to arrive at the "claimed amount." Wallwork Rep. at 65-66. He did not explain the source of either the "daily rate" or the "cost." *Id*.

certainty, the amount of additional interest and fees incurred as a result of any such extensions. *See* Def. Mem. at 26-31. Plaintiffs counter that "sufficient documentary and testimonial evidence exists to allow this claim to be heard at trial." Pl. Reply Mem. at 21. Specifically, plaintiffs point to approximately 800 pages of loan-related documents that they submitted with their summary judgment papers, *see* Wojak Declaration Exs. 124 to 129 (Dkts. 210-4 through 210-19), and argue that this evidence will be "sufficient," when combined with Blumenfeld's anticipated trial testimony, "to allow a jury to hear the evidence and award damages." Pl. Reply Mem. at 24. However, plaintiffs conspicuously fail to explain how *any* of the numbers provided to Wallwork can be derived from the documents they submitted.

In a delay damages case, "additional financing costs" may be recoverable as consequential damages. *McNally Wellman Co., a Div. of Boliden Allis v. New York State Elec. & Gas Corp.*, 63 F.3d 1188, 1195 (2d Cir. 1995); *accord, Int'l Fid. Ins. Co. v. Cnty. of Rockland*, 98 F. Supp. 2d 400, 416 (S.D.N.Y. 2000). But such damages are not automatic; the plaintiff must show that it was required to extend an existing loan, take on new debt, or incur other financing costs "as a result of" the delay attributable to the defendant. *Manshul Const. Corp. v. Dormitory Auth. of New York*, 79 A.D.2d 383, 387, 436 N.Y.S.2d 724, 728 (1st Dep't 1981); *see also Sheraton Operating Corp. v. Castillo Grand, LLC*, 34 Misc. 3d 1207(A), 943 N.Y.S.2d 794, 2011 WL 6973239, at *49 (Sup. Ct. Westchester Co. November 18, 2011) (where Sheraton's delays required Castillo to extend its construction loan, it was entitled to recover "$13,127,783 in interest payments that it would not have been required to pay but for Sheraton's breach"). Additionally, as previously discussed, the claimant must prove both the existence and the amount of its damages with "reasonable certainty." *Tractebel Energy*, 487 F.3d at 111.

(a)    **AIG Loan**

The AIG Loan, taken out in 2016, was a fixed-rate loan, at 5.01%, with a 15-year term and a maturity date of October 31, 2031. Pl. Resp. 56.1 St. ¶¶ 109-10; *see also* Blumenfeld Dep. Ex. 188. Blumenfeld explained that there were actually two AIG loans (the "project loan" and the "construction loan"), in the aggregate amount of $87 million. Blumenfeld Dep. Tr. I at 37:16-38:6. He could not recall the specific amounts of the constituent loans, *id.* at 38:7-9, and his "cheat sheet" did not differentiate between the two. Blumenfeld Dep. Ex. 188, at 1.[15] The project loan was used for preconstruction costs, while the building loan funded the actual construction process. Blumenfeld Dep. Tr. I at 37:21-38:19. Blumenfeld further explained that the building loan was a "construction to perm loan," Blumenfeld Dep. Tr. I at 43:16-17, that is, a "hybrid," designed to remain in place as permanent financing on the building after construction was completed. *Id.* at 44:3-15 (explaining the business advantages of having "one loan" for both purposes).

Blumenfeld also disclosed that BDG paid off the AIG Loan (as well as part of the EB-5 Loan, and the entire AIG Bridge Loan, discussed below) at the end of 2021, when it refinanced the Project through a new $125 million loan from Invesco (the Invesco Loan). Pl. Resp. 56.1 St. ¶ 111; Blumenfeld Dep. Tr. I at 40:10-41:2, 41:19-21. BDG did this, according to Blumenfeld, because "AIG was not happy being on the loan anymore due to all the overruns and the delays. [So] [w]e went out, secured new financing, [and] took AIG out." *Id.* at 42:23-43:1.

The Wallwork Report and Rebuttal do not mention the Invesco Loan, and plaintiffs have never produced any documents relating to that loan. Pl. Resp. 56.1 St. ¶ 112.[16] Plaintiffs did

---

[15] In their brief, plaintiffs describe the AIG Loan as being "made up of a $74 Mill[i]on direct loan . . . plus an additional $13 Million in bond proceeds." Pl. Reply Mem. at 23.

[16] The only document now before the Court that even mentions the Invesco Loan is Blumenfeld's "cheat sheet," which recites in one line that the Invesco Loan was taken out on 12/30/21, in the

produce a number of documents relating to the AIG Loan, but identify only three monthly account invoices (all from 2020), showing the interest and other charges due in those months. All of the invoices reflect a fixed 5.01% interest rate, and therefore presumably relate to the AIG Loan. However, they bear three different loan numbers and report three different principal balances (which do not add up to $87 million).[17]

These facts present three distinct difficulties for BDG. First, there is no evidence in the record that the AIG Loan (or any portion of it) was *extended*, or that any *additional* interest or fees were charged on that loan because of the construction delays caused by the June 25, 2018 accident. To the contrary: because the building loan was "construction to perm," BDG always anticipated leaving it in place as permanent financing after construction was completed, which means that BDG would have continued to pay 5.01% interest on that loan through 2031. *See* Blumenfeld Dep. Tr. I at 80:15-20. Blumenfeld conceded this point at deposition:

> Q.    So walk me through how any alleged delays caused by Western caused extended interest to BDG. In other words, weren't they always anticipating paying down this loan through 2031?
>
> A.    Right, but you didn't get the profitability or lease up. So you would offset this loan by income on the building. And you didn't get that because of the delay from the accident.

---

initial amount of $125 million, at "SOFR + 320bp," meaning the Secured Overnight Financing Rate plus 320 basis points. *See* Blumenfeld Dep. Ex. 188.

[17] The April 2020 statement, labeled "Gotham-BDG" (Loan # 2237101), reflects a current principal balance of $61,373,694.41 (up from $59,228,923.48 the previous month), and current interest due of $236,843.44. (Dkt. 210-8 at ECF p. 30.) That statement also reflects a "current reserve escrow due" of $4,855.00 and "current misc. amount due" of $8,500.00, for a total monthly charge $250,198.44. (*Id.*) The July 2020 statement, labeled "Gotham-Bond" (Loan #2237121), reflects a current principal balance of $13,000,000.00 (unchanged from the previous month), current interest due of 54,275.00, and no additional charges. (*Id.* at ECF p. 51.) The August 2020 statement, labeled "Gotham-PRJ" (Loan #2237111) reflects a current principal balance of $8,671,876.01 (unchanged from the previous month), current interest due of $36,205.08, and no additional charges. (*Id.* at ECF p. 50.)

Blumenfeld Dep. Tr. I at 80:15-24. As to the AIG Loan, therefore, plaintiffs have not presented any admissible evidence showing that they incurred any recoverable damages.

Second, there is no evidence in the record from which the Court (or a reasonable jury) could determine what those damages would be. *See Tractebel Energy*, 487 F.3d at 110 (plaintiff must establish both the "*existence*" and "*amount* of damage" with "reasonable certainty"). BDG told Wallwork that it incurred "extended interest and fees" on the AIG Loan at a "daily rate" of $7,459.51. Wallwork Rep. at 66. The only further calculation that Wallwork performed was to multiply that figure by 185 to arrive at a "claimed amount" of $1,380,008.44. *Id*. Nowhere in plaintiffs' summary judgment papers, however, do they explain the basis of that $7,459.51 "daily rate." To be sure, they argue vigorously that the documents annexed to the Wojak Declaration "clearly show the interest costs and fees incurred by BDG." Pl. Reply Mem. at 24. But they conspicuously fail to lay out those costs and fees in a manner that adds up to $7,459.51 (or any other specific figure) per day. *See id.* at 22-24. Nor has this Court been able to derive that daily rate (or indeed *any* daily rate) from scattered documents now before it – despite considerable effort. Thus, plaintiffs have failed to present admissible evidence showing the *amount* of the claimed damages on the AIG loan. *See Arch Specialty Ins. Co. v. TDL Restoration, Inc.*, 2021 WL 111670, at *1 (S.D.N.Y. Jan. 12, 2021) ("[A] plaintiff does not carry its burden on a motion for summary judgment 'by simply dumping documents as exhibits to [its] motion.'") (citation omitted).

Third, there is no evidence in the record from which the Court (or a reasonable jury) could award damages based on the Invesco refinancing at the end of 2021. Blumenfeld suggested that the delays caused by Western contributed to its decision to refinance through Invesco. *See*

Blumenfeld Dep. Tr. I at 42:23-24 (AIG was not happy with "all the overruns and the delays").[18] However, BDG cannot premise any damages claim on the costs incurred to refinance, because plaintiffs do not claim any damages "outside of those addressed in its expert reports," SUF ¶ 114, and because they have never produced a single piece of paper (beyond Blumenfeld's "cheat sheet") documenting either the terms of the Invesco Loan or any related costs.

As to the AIG Loan, therefore, plaintiffs have failed to produce "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party," *Anderson*, 477 U.S. at 249, and therefore have failed to raise a genuine issue for trial.

> **(b)**    **EB-5 Loan**

BDG obtained $25 million in "EB-5 financing," that is, financing provided by "foreign nationals [seeking] green cards," to cover part of the Project costs. Blumenfeld Dep. Tr. I at 37:5-15. The EB-5 Loan was originated in 2017, carried interest at 6.4%, and was due to mature in 2022. Blumenfeld Dep. Ex. 188. However, BDG used the Invesco refinancing in December 2021 to take out "9 million of the EB-5 loan." Blumenfeld Dep. Tr. I at 40:10-11, 48:17-18. There is no evidence in the record suggesting that the remaining portion of the EB-5 Loan was extended or that BDG otherwise incurred excess costs on that loan due to the delays caused by Western. *See id*. at 51:21-22 (the EB-5 loan had "three one-year extensions built into it"); *id*. at 52:13-16 (BDG exercised those extensions because "[w]e didn't have the equity to pay them off"); *id*. at 52:17-21 ("Q: [W]hy didn't you have the equity?" "A: We just don't."). As to the EB-5 Loan, therefore, plaintiffs have not presented admissible evidence sufficient to show that they incurred any recoverable delay damages.

---

[18] Later in his deposition, Blumenfeld acknowledged that although BDG was "behind schedule," and AIG was "a little uncomfortable with the overall deal," BDG was "never in default" and did not fall behind on any payments. Blumenfeld Dep. Tr. I at 47:5-25.

Nor have they presented evidence sufficient to show the amount of any such damages. BDG told Wallwork that it incurred "extended interest and fees" on the AIG Loan at a "daily rate" of $4,548.61. Wallwork Rep. at 66. Wallwork then multiplied that figure by 185 to arrive at the "claimed amount" of $841,493.07. *Id*. As in the case of the AIG Loan, however, plaintiffs' summary judgment papers fail to explain the basis of that daily rate or point to any documents from which it can reliably be calculated.[19]

Because plaintiffs have failed to identify admissible evidence in the record that would permit them to establish, with reasonable certainty, either the existence or the amount of any "extended interest and fees" incurred on the EB-5 Loan, defendants are entitled to summary judgment as to this item of claimed damages. *See Tractebel Energy*, 487 F.3d at 110.

### (c)    AIG Bridge Loan

Plaintiffs fare somewhat better with respect to the $15 million AIG Bridge Loan, which was initiated on April 10, 2020, at an interest rate of 5.50%, *see* Blumenfeld Dep. Ex. 188, and "taken out," along with the original AIG Loan and part of the EB-5 Loan, as part of the Invesco refinancing at the end of 2021. Blumenfeld Dep. Tr. I at 48:16-21. Blumenfeld testified that the AIG Bridge Loan was obtained "to cover shortfalls due to the accident." *Id*. at 40:13; *see also id*. at 46:14-22, 47:5-14 (AIG "had to give us a bridge loan" because "the accident caused a series of delays that just exponentially grew"). There is thus at least some evidence in the record that BDG

---

[19] Plaintiffs have submitted the EB-5 loan agreement, showing the principal amount and the interest rate. (Dkt. 210-13 at ECF pp. 5, 22-23.) They have also submitted a sampling of monthly invoices for the EB-5 Loan. However, while some of those invoices reflect a daily interest rate of $4,444.44 and a daily loan servicing fee of $104.17, for a total daily charge of $4,548.61 (*e.g.*, Dkt. 210-14 at ECF p. 58 (invoice for June 2020)), others reflect a daily interest rate of only $2,222.22, computed at the annual rate of 3.2%, plus the servicing fee, resulting in a daily rate of $2,326.39. (*E.g.*, Dkt. 210-14 at ECF pp. 56, 60 (invoices for July and September 2020).) Thus, absent a complete set of monthly EB-5 invoices, it is impossible to determine an appropriate "daily" rate for purposes of computing delay damages.

was obliged to take out the AIG Bridge Loan because of the construction delays caused by Western.

Additionally, plaintiffs may be able to quantify their costs incurred in obtaining the AIG Bridge Loan. BDG told Wallwork that that the total "[c]ost of this [i]tem" was $3,200,810.08. Wallwork Rep. at 66. Wallwork then allocated 27.6% of that figure to Western to arrive at the "claimed amount" of $883,423.58. *Id*. Plaintiffs do not explain, in their summary judgment papers, how BDG calculated the total cost figure it supplied to its damages expert, or how that number can be derived from the admissible evidence in the record. Nor, for that matter, do they submit the original loan agreement, monthly account invoices, or any other documents substantiating the claimed 5.5% interest rate on the AIG Bridge Loan. But they did submit a group of invoices for various services provided in connection with *obtaining* the loan. *See* Wojak Decl. Ex. 125 (Dkt. 210-9). These invoices, all dated in or about April 2020, cover items such as title insurance, surveying fees, legal fees for "[a]dvice and counsel regarding recapitalization" of the Project, modification fees charged by AIG, and a commission charged by Greystone Capital Partners for its advisory services in connection with "the origination/structuring of a new subordinate loan for the Project." *Id.* at ECF pp. 10, 13. These fees add up to $1,623,704.10 (roughly half of the figure provided to Wallwork), of which Western's share (according to Wallwork) would be 27.6%, or $448,142.33.

The evidence summarized above may be enough to allow a rational jury to conclude that plaintiffs are entitled to damages, in a specific amount, in connection with the AIG Bridge Loan. Consequently, defendants' motion will be denied with respect to that loan.

### (d)    Valley & Member Loans

Although Wallwork treated the "Valley & Member Loans" as a single item, *see* Wallwork Rep. at 66, he testified that these are actually a group of loans, including a loan issued by Valley Bank (the Valley Loan) and various loans provided by members of the Blumenfeld family (the Member Loans). SUF ¶ 126. Wallwork did not know what portion of this claim is attributable to the Valley Loan and what portion is attributable to the Member Loans. *Id.* ¶ 127. Nor did he provide any testimony as to whether, when, or how any of the constituent loans were "extended," or newly obtained, due to the construction delays caused by Western. Instead, he accepted BDG's representation that the total "[c]ost of this item" was $8,035,136.10, which he then multiplied by 27.6% to arrive at the figure of $2,217,697.56 as the "claimed amount" attributable to Western. Wallwork Rep. at 66.

Blumenfeld explained, at deposition, that the Valley Loan began in 2018 as a revolving line of credit, "not for this project but for Blumenfeld Development Group." Blumenfeld Dep. Tr. I at 55:7-15, 56:2-4. Blumenfeld was not sure whether the entire $27 million available under that line of credit was ever drawn down, nor how much of it was used for the Project. *Id.* at 56:8-20 (estimating that "$22 million at one point" was used "on this project"). The line of credit then "got transferred to a Valley loan on 2/10/21 of $21 million," which was "project specific," *id.* at 56:5-9, 57:9-21, and has since been paid down "to about 19 [million]." *Id.* at 58:9-10. As for the Member Loans, they came from various members of the Blumenfeld family, or related entities, under a "blanket loan agreement that gets used – it gets used for multiple projects, but then gets accounted for specific to the project." *Id.* at 58:11-59:7. According to Blumenfeld, $6 million was "specific to this project," and was used for "[e]quity." *Id.* at 59:7-14. Asked if he knew what costs, specifically, were paid by the Member Loans, Blumenfeld replied, "Do I know? No, I don't know.

There is a draw-down schedule somewhere, and then you'd have to go into the draw-down schedule and figure out what was paid that month." *Id*. at 60:4-8.

According to plaintiffs' lawyers, Blumenfeld also testified, at deposition, as to why the Valley line of credit, the Valley Loan, and the Member Loans "were necessary due to the delays caused by Western." Pl. Reply Mem. at 25. However, they do not quote any such testimony, and the Court has been unable to locate any. Nor do plaintiffs point to any evidence in the record from which a jury could find, with "reasonable certainty," *Tractebel Energy*, 487 F.3d at 111, that BDG extended the Valley line of credit, obtained or extended the Valley Loan, or borrowed more money than it otherwise would have from the Blumenfeld family, "as a result of" the construction delays attributable to Western. *Manshul Const. Corp.*, 79 A.D.2d at 387, 436 N.Y.S.2d at 728. At summary judgment, when a plaintiff must "put up or shut up," *Weinstock*, 224 F.3d at 41, it is insufficient for a plaintiff merely to argue, in its brief, that there must be *some* causal link between the delays and this component of BDG's financing package.

 Further, plaintiffs do not even begin to explain the calculation underlying this aspect of their damages claim. To sustain the claim, plaintiffs would be required to show, with "reasonable certainty," that there is a total cost figure associated with the excess interest or other costs paid on the Valley & Member Loans due to the construction delays, of which 27.6% (or whatever percentage plaintiffs establish to the satisfaction of the jury) can be attributed to Western. Given the complicated landscape, this is presumably a complex calculation.[20] In their brief, however, plaintiffs merely note that a "package of documentation" was produced during discovery, consisting of "invoices from VNB for the loans," and assure the Court that "Mr. Blumenfeld will

---

[20] Among other complications, the original Valley line of credit, the Valley Loan, and the Member Loans (listed on Blumenfeld's "cheat sheet" as "Blumenfeld Family Loans," all bore interest at a "variable" rate. Blumenfeld Dep. Ex. 188.

testify at trial in detail regarding these loans, their genesis, and their connection to the project delays." Pl. Reply Mem. at 25. For the reasons previously discussed, *see* Part III(D)(1), *supra*, plaintiffs were required to "come forward with sufficient evidence of damages to defeat the present summary judgment motion," *W.S.A.,* 1998 WL 635536, at *6, including admissible evidence showing "the *amount* of such damages (or at least a fair estimation of same)." *New Paradigm Software Corp.*, 2002 WL 31749396, at *16. They have utterly failed to do so, choosing instead to "dump" a mass of documents on the Court, *see Arch Specialty*, 2021 WL 111670, at *1, without explaining how those documents support the claimed damages. Consequently, defendants are entitled to summary judgment as to delay damages premised on the Valley & Member Loans.

### 4.    Home Office Overhead

BDG and ZDG seek a total of $843,005.82 for increased costs incurred by their respective "home offices" as a result of delays caused by Western. This amount includes (i) $534,449.73 incurred by BDG Staff; (ii) $192,002.67 incurred by BDG Legal Staff; (iii) $22,963.20 incurred by ZDG CFO; (iv) $18,768.00 incurred by ZDG Legal; (v) $67,344.00 incurred by ZDG's VP Director of Construction; and (vi) $7,478.22 incurred by ZDG's Accountant. Pl. Resp. 56.1 St. ¶¶ 134, 137, 139, 141, 143, 145. Defendants move for summary judgment on this item of damages, arguing that plaintiffs have failed to produce any admissible evidence that their home office overhead increased as a result of the delay. Def. Mem. at 31.

A plaintiff suing for damages resulting from construction delay may be able to recover an allowance for additional overhead beyond the expenses incurred on the construction site, including expenses incurred by the contractor's office – so-called "home office overhead." *Thalle Const. Co. v. Whiting-Turner Contracting Co.*, 39 F.3d 412, 418 (2d Cir. 1994). However, the plaintiff "bears the burden of proving that it did, in fact, sustain an increase in home office overhead." *Am.*

*Underground Eng'g, Inc. v. City of Syracuse*, 2011 WL 4809882, at *6 (N.D.N.Y. Oct. 11, 2011), *aff'd*, 526 F. App'x 37 (2d Cir. 2013); *see also Berley Indus., Inc. v. City of New York*, 45 N.Y.2d 683, 687-88, 385 N.E.2d 281, 283 (1978) (rejecting plaintiff's home office overhead calculation where "there was no showing that the delay caused an increase in home office activity or expense of any kind" and "no claim by the plaintiff that proof was not available"). The plaintiff must also establish "the extent to which its costs were increased by the improper acts' of the defendant." *Am. Underground Eng'g*, 2011 WL 4809882, at *6 (quoting *Berley Indus.*, 45 N.Y.2d at 687, 385 N.E.2d at 283); *see also Thalle Const.*, 39 F.3d at 418 ("courts have allowed recovery if the plaintiff can show that the delays required overhead costs above what would have been incurred otherwise").

Here, there is no evidence in the record from which the Court (or a reasonable jury) could determine either the existence or the amount of plaintiffs' claimed overhead damages. For example, although Wallwork opined that "[d]ue to delays caused by Western and Giugiaro, extended payroll costs were incurred by BDG," at a "[d]aily rate" of $2,888.92, he did not provided any explanation or backup – either for the proposition or for the amount – and the only calculation *he* performed was to multiply the "daily rate" by 185 days to arrive at the "claimed amount" of $534,449.73. Wallwork Rep. at 66-67. At deposition, Wallwork testified that the "amounts . . . used to calculate the daily rate" were "provided by BDG[.]" Wallwork Dep. Tr. III at 234:8-10. The figures Wallwork attributes to the other challenged items of overhead are equally unexplained. *See* Wallwork Rep. at 74-75 (BDG Legal Staff); *id.* at 58-59 (ZDG CFO, Legal, Director of Construction, and Accountant).

Nowhere in plaintiffs' summary judgment papers do they set forth the basis for a single one of their "daily rate" figures, much less point to any supporting evidence. Moreover, they readily

concede that they "did not timely produce any documentary evidence establishing that they incurred *any* actual increase in their home office expenses." Pl. Resp. 56.1 St. ¶ 147 (emphasis added). They further admit that they "have no admissible documentary evidence in support of" any component of their home office overhead claim. *Id.* ¶¶ 135, 138, 140, 142, 144, 146. Instead, plaintiffs state that they "intend to present testimonial evidence at trial regarding these damages." *Id*. ¶¶ 135-38, 140, 142, 144, 146-47. At that time, they say, they need only "demonstrate a 'stable foundation for a reasonable estimate' of the damages caused by Western," Pl. Reply Mem. at 25 (quoting *LifeTree Trading Pte., Ltd. v. Washakie Renewable Energy, LLC*, 2017 WL 2414805, at *4 (S.D.N.Y. June 2, 2017)), which they will do through "[l]ay witness testimony." *Id.*

Once again, plaintiffs fail to appreciate their burden on summary judgment. Regardless of whether home office overhead damages are characterized as general (requiring only a "stable foundation" for a "reasonable estimate" of the amount) or consequential (requiring "reasonable certainty" as to the amount), this was the time for plaintiffs to cite to "materials in the record," Fed. R. Civ. P. 56(c)(1)(A), sufficient to show both the existence and the amount (or at least an estimate) of their allegedly increased home office costs. *U.S. Bancorp Oliver-Allen Tech. Leasing*, 2005 WL 1875459, at *4; *New Paradigm Software Corp.*, 2002 WL 31749396, at *15-17; *W.S.A.*, 1998 WL 635536, at *6. Put simply, "[t]he non-movant is not entitled to a trial on the basis of a hope that [it] can produce some evidence at that time." 10A Wright, Miller & Kane, Federal Practice & Procedure § 2727.2, at 513-16 (2016); *see also Soc'y of New York Hosp. v. Associated Hosp. Serv. of New York*, 367 F. Supp. 149, 155 (S.D.N.Y. 1973) ("The opposing party cannot obtain a denial of a motion for summary judgment 'on the basis of a hope that some evidence might develop at trial'") (quoting *Schneider v. McKesson & Robbins, Inc*., 254 F.2d 827, 831 (2d Cir. 1958)).

Having failed to "reference a document, submit an affidavit or even identify their lay witnesses," Def. Reply Mem. at 18, plaintiffs will not be "given yet another opportunity to uncover and present" whatever evidence they may hope to develop to support their home office overhead claim "at trial." *U.S. Bancorp Oliver-Allen Tech. Leasing*, 2005 WL 1875459, at *4. Consequently, defendants are entitled to summary judgment as to this item of damages.

### 5.    Insurance Deductibles

Plaintiffs seek to recover the deductibles on two insurance policies that will likely pay the claims brought by the workers injured in the June 25, 2018 accident. SUF ¶ 135; Pl. Resp. 56.1 St. ¶¶ 149-50; Pl. Reply Mem. at 26.[21] Plaintiffs seek a total of $750,000 under two policies in ZDG's Contractor Controlled Insurance Program (CIP) covering the Project: a $500,000 deductible under the CIP's General Liability Policy and a $250,000 deductible under the CIP's Worker's Compensation Policy. Wallwork Rep. at 69-70; Pl. Damage Chart at 1; *see generally* Subcontract, Ex. D (Dkt. 195-5 at ECF pp. 21-50) (CIP Insurance Manual). Defendants argue that since plaintiffs have not yet paid either deductible, *see* SUF ¶ 136, their claim for indemnification has not yet accrued (and may never), making this aspect of their damages claim unripe. Def. Mem. at 32-33.[22]

Defendants are correct. Under New York law, "a cause of action for contractual indemnification 'does not arise until liability is incurred by way of actual payment' to a third party." *Lehman XS Trust, Series 2006-GP2 v. GreenPoint Mortg. Funding, Inc.*, 916 F.3d 116, 126 (2d

---

[21] According to the parties, the personal injury suits filed by the injured ironworkers remain pending in state court. *See* SUF ¶ 136.

[22] Defendants also contend that, if and when the claim for indemnification of insurance deductibles accrues, it is barred by the Subcontract's anti-subrogation clause, which releases all claims between CIP participants for any "covered loss." Def. Mem. at 33-34. Because plaintiffs have not shown that their claim for indemnification has accrued, the Court does not reach the anti-subrogation issue.

Cir. 2019) (quoting *Varo, Inc. v. Alvis PLC*, 261 A.D.2d 262, 265 (1st Dep't 1999)). Thus far, no payment has been made (or, according to defendants, even demanded). Def. Mem. at 32. Thus, while it may be true that "the deductibles will be paid and ZDG can seek indemnity from Western at that time," Pl. Reply Mem. at 26, ZDG cannot seek indemnity from Western now. Summary judgment will be granted for defendants as to ZDG's claim for indemnification of insurance deductibles, and the claim will be dismissed without prejudice, as premature.

### 6.    Legal and Professional Fees

Plaintiffs seek to recover the legal fees and related expenses incurred to pursue their claims against Western, including in this action and in a parallel action concerning plaintiffs' insurance coverage. SUF ¶¶ 137-40. As of April 30, 2023, plaintiffs incurred a total of $2,809,918.48 in attorney fees paid to the law firms Peckar & Abramson, SUF ¶ 140 ($1,081,623.30); Duane Morris, *id.* ¶ 137 ($917,659.85); and Pillsbury Winthrop Shaw Pittman, *id.* ¶ 138 ($810,635.33). Because these fees continue to accrue, plaintiffs reserve their rights to pursue additional fees in the future. *Id.* at 25 n.5. Additionally, plaintiffs seek $154,949.36 in litigation expenses, principally related to their expert reports. *Id.* Defendants seek summary judgment disallowing these damages on the ground that, under the Subcontract, plaintiffs are not entitled to fees incurred in first-party (or "interparty") rather than third-party actions. Def. Mem. at 34-36.

Plaintiffs contend that the Subcontract's "Indemnification" clause, at Article 22, makes it unmistakably clear the parties intended to shift fees in a case such as this. That clause provides, in relevant part:

> To the fullest extent permitted by law, [Western] shall indemnify, defend and hold harmless [ZDG], [BDG], Lender . . . and all other Indemnitees from and against all claims, suits, damages, losses, liabilities, and disbursements and expenses (*including, without limitation, attorneys' fees and costs incurred in connection with the enforcement of this Agreement*) arising out of or resulting from the performance or non-performance of the Work or arising out of the breach of this Agreement[.]

Subcontract § 22.1 (emphasis added).

Under the general rule in New York, attorneys' fees are ordinary incidents of litigation and may not be awarded to the prevailing party unless authorized by agreement between the parties, statute, or court rule. *Oscar Gruss & Son, Inc. v. Hollander*, 337 F.3d 186, 199 (2d Cir. 2003) (collecting cases). Thus, the New York Court of Appeals has recognized that the typical indemnification clause "contemplate[s] reimbursement when the indemnitee is required to pay damages on a third-party claim," whereas an indemnification clause that "support[s] an inference that defendant promised to indemnify plaintiff for counsel fees in an action on the contract" is the exception. *Hooper Assocs., Ltd. v. AGS Computers, Inc.*, 74 N.Y.2d 487, 492, 548 N.E.2d 903, 905 (1989). Because "[p]romises by one party to indemnify the other for attorneys' fees run against the grain of the accepted policy," courts "'should not infer a party's intention' to provide counsel fees as damages for a breach of contract 'unless the intention to do so is unmistakably clear' from the language of the contract." *Oscar Gruss*, 337 F.3d at 199 (quoting *Hooper*, 74 N.Y.2d at 492, 548 N.E.2d at 905); *see also Tokyo Tanker Co. v. Etra Shipping Corp.*, 142 A.D.2d 377, 380, 536 N.Y.S.2d 75, 77-78 (1st Dep't 1989) (an indemnity provision "should not be extended to include damages which are neither expressly within its terms nor of such character that it is reasonable to infer that they were intended to be covered under the contract") (quoting *Niagara Frontier Transp. Auth. v. Tri-Delta Const. Corp.*, 107 A.D.2d 450, 487 N.Y.S.2d 428, 431, *aff'd*, 65 N.Y.2d 1038, 484 N.E.2d 1047 (1985)).

In determining whether a contractual indemnity provision is sufficiently clear to rebut the presumption against indemnification of interparty litigation expenses, courts consider: (1) "whether the provision 'unequivocally indicate[s] that the parties intended to indemnify attorneys' fees in lawsuits between themselves,' or whether it instead 'contain[s] only broad language,'" and

(2) "whether 'future third-party claims were possible at the time of the contract,' or whether 'it is apparent that no third party claims were contemplated by the parties.'" *In re Platinum-Beechwood Litig.*, 378 F. Supp. 3d 318, 324 (S.D.N.Y. 2019) (alterations in original) (quoting *In re Refco Sec. Litig.*, 890 F. Supp. 2d 332, 343-44 (S.D.N.Y. 2012)). "Where a provision 'is subject to a reasonable interpretation one way or another, the agreement must be construed not to indemnify one party's legal expenses in defending against another party's claims.'" *Id.* (cleaned up) (quoting *Refco*, 890 F. Supp. 2d at 343). Accordingly, where "language may easily be read as limited to third party actions," an inter-party "award of fees cannot . . . be supported by the contract's indemnification clause." *Bridgestone/Firestone, Inc. v. Recovery Credit Servs.*, 98 F.3d 13, 21 (2d Cir. 1996).

Applying these principles to the provision at issue here, the Court concludes that the language of Article 22 does not rebut the presumption against indemnification of interparty litigation expenses. First, § 22.1 "contains only broad language that does not unequivocally indicate that the parties intended to indemnify attorneys' fees in lawsuits between themselves." *Platinum-Beechwood*, 378 F. Supp. 3d at 325 (quoting *Refco*, 890 F. Supp. 2d at 344; *see, e.g.*, *U.S. Fid. & Guar. Co. v. Braspetro Oil Servs. Co.*, 369 F.3d 34, 75 n.35 (2d Cir. 2004) (gathering cases involving indemnification provisions that the Court of Appeals "would deem to be 'unmistakably clear' in this regard").

Second, it is clear from the terms of Article 22 that "future third-party claims were possible at the time of the contract." For example, § 22.3 expressly contemplates indemnification for "claims against any person or entity indemnified under this Article 22 by *an employee of Subcontractor, a sub-subcontractor or anyone directly or indirectly employed by them or anyone for whose acts they may be liable*[.]" Subcontract § 22.3 (emphasis added).

Third, the language of Article 22 can "easily be read as limited to third party actions." *Bridgestone/Firestone*, 98 F.3d at 21. In *Oscar Gruss*, the Second Circuit interpreted a similar indemnification clause as so limited. 337 F.3d at 199. There, the agreement provided that one contracting party would reimburse the counterparty for any "legal or other expenses" incurred in connection with "any lawsuits, investigations, claims or other proceedings arising in any manner out of or in connection with the rendering of services by [plaintiff] hereunder (*including, without limitation, in connection with the enforcement of this Agreement* and the indemnification obligations set forth herein)." *Id.* Examining this language "in light of . . . surrounding provisions," which were limited to third-party claims, the court found that the parenthetical "can apply only to a situation where [one party] refuses to indemnify [the other party] from a third party action," not from interparty actions. *Id.* Similarly, in *Hooper*, where the defendant agreed to "indemnify and hold harmless [plaintiff] . . . from any and all claims, damages, liabilities, costs and expenses, including reasonable counsel fees," 74 N.Y.2d 487, 492, 548 N.E.2d 903, 905 (alteration and ellipsis in original), the Court of Appeals found that the clause was neither "exclusively or unequivocally referable to claims between the parties themselves [nor] support[ed] an inference that defendant promised to indemnify plaintiff for counsel fees in an action on the contract." *Id.* (adding that this finding was reinforced "by other provisions in the contract which unmistakably relate to third-party claims").

The same is true here. Other provisions in Article 22 "unmistakably relate to third-party claims." *See, e.g.*, Subcontract § 22.3. Since the language of the Subcontract does not rebut the presumption against shifting fees, defendants are entitled to summary judgment as to plaintiffs' fees, and related ligation costs, incurred in pursuing this action.

## IV.    CONCLUSION

For the reasons stated above, plaintiffs' motion for partial summary judgment (Dkt. 195) is GRANTED IN PART, as to Western's liability for breach of contract and the Surety's liability for breach of the Performance Bond.

Defendants' cross motion for partial summary judgment (Dkt. 203) is also GRANTED IN PART, as to plaintiffs' claims for negligence and gross negligence against Western, which are hereby DISMISSED, and as to the following categories of damages: Lost Revenue; Lost Marketing; Extended Loan Expenses associated with the AIG Loan, the EB-5 Loan, and the Valley & Member Loans; Home Office Overhead; Insurance Deductibles (without prejudice), and Legal and Professional Fees. In all other respects both motions are DENIED.

The parties are directed to submit their proposed Joint Pretrial Order, in accordance with this Court's Individual Practices, no later than October 30, 2024, along with a joint letter setting out their availability for trial during the first quarter of 2025.

Dated: New York, New York
          September 30, 2024                         **SO ORDERED.**


_____
**BARBARA MOSES**
**United States Magistrate Judge**